IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Thomas Eftenoff,<br><br>    Petitioner,<br><br>vs.<br><br>Charles L Ryan, et al.,<br><br>    Respondents. | No. CV 14-01023-PHX-NVW(MHB)<br><br>**REPORT AND RECOMMENDATION**<br>**RE: MOTION TO STAY AND ABEY** |

TO THE HONORABLE NEIL V. WAKE, UNITED STATES DISTRICT JUDGE:

    On May 12, 2014, Petitioner Brian Thomas Eftenoff, who is confined in the Arizona State Prison Complex, Red Rock Unit, Eloy, Arizona, filed a *pro se* Petition for Writ of Habeas Corpus (hereinafter "habeas petition") pursuant to 28 U.S.C. § 2254 (Doc. 1). On October 20, 2014, a Notice of Appearance on Petitioner's behalf was filed by attorney Lee Phillips of the Arizona Innocence Project. (Doc. 14.) Respondents filed their Answer to Petitioner's habeas petition on October 21, 2014. (Doc. 16.) On December 22, 2014, Petitioner filed his Reply, and simultaneously, a Motion to Stay and Abey Habeas Proceedings (hereinafter "stay and abey motion"). (Docs. 24, 25.) Respondents filed their Response to the motion, objecting to a stay and abey of the habeas proceedings, and on February 3, 2015, Petitioner filed his reply to Respondents' response to his stay and abey motion. (Docs. 28, 31.)

\\\

**BACKGROUND**

Petitioner was indicted on one count of murder in the second degree, a class one felony for the September 23, 1999, death of his wife Judi Eftenoff and one count of transfer of narcotic drugs, a class 2 felony for sending cocaine to his in-laws on or between October 8 and 13, 1999. (Doc. 16, at 9.) Petitioner was convicted at trial on both counts. On appeal he raised the following issues: (1) failure to sever counts; (2) failure to conduct severance hearing; (3) failure to grant directed verdict; (4) failure to conduct competency of minor to testify hearing; (5) prosecutorial misconduct in implying existence of non-existent evidence; (6) failure to conduct mandatory voluntariness hearing; (7) juror misconduct; (8) failure to exclude witness; (9) improper other bad acts testimony; and, (10) failure to grant mistrial/new trial. (Doc. 1-1, at 3.) Petitioner's conviction and sentence were later affirmed on appeal. (Doc. 17-2, at 2.) The Arizona Court of Appeals summarized the facts supporting Petitioner's convictions and sentences as follows:

> ¶1 . . . The defendant was charged with second degree murder following the death of his wife. The medical examiner attributed the death to an intra-cerebral hemorrhage due to cocaine intoxication. Eftenoff was also charged with transfer of narcotic drugs after he shipped a box of the victim's personal effects to his in-laws. Among other items, the box contained cocaine and a note which stated everything in the box had a story.
>
> ¶12 The victim died sometime during the night of September 23-24, 1999. A neighbor saw the victim returning from her mailbox between 9:00 and 10:00 p.m. on September 23 and she appeared normal. A friend came to Eftenoff's home the evening of September at approximately 9:30 and was there one-half to one hour before he and Eftenoff left, eventually going to a casino. The friend never saw the victim when he was at the defendant's home. Video from the casino showed Eftenoff and his friend going into the casino at 11:43 p.m. on September 23, 1000, changing a tire in the casino parking lot, and staying until approximately 5:20 a.m. that morning. Whenever his friend ran out of money, Eftenoff gave him more so they could continue to gamble. If the defendant had not continued to give him money, his friend would have asked to leave the casino. After they returned to Eftenoff's home, his friend used the telephone in Eftenoff's home office and left. He never saw the victim. The friend admitted that he had used cocaine with the defendant and the victim in the past and that either he or Eftenoff had supplied the cocaine used.

\\\

¶13  A live-in nanny helped take care of the Eftenoff's two children. She was out the evening of September 23 and did not return to the residence until approximately 1:00 a.m. on September 24. She did not see the victim or Eftenoff that evening. She awoke later that morning to the sound of Eftenoff yelling and pounding on her bedroom door. Eftenoff testified that after his friend left the house after their night at the casino, he went to the master bath and found the victim on the floor. He told the nanny that the victim was injured, and asked if she heard anything or knew what was going on. Eftenoff then took his daughter to his son's bedroom, turned on the television, and closed the door. The nanny followed him into the master bedroom, where she saw the victim on the floor of the bathroom. The defendant had already called the 911 operator, who was still on the line.

¶14  Eftenoff pointed out bruises on the victim's thigh and arm to the nanny. He told her that someone must have come in the house and hurt the victim and that something must have happened. The defendant then attempted CPR. Later, while the nanny was speaking to a police officer at the home, Eftenoff signaled to her that the victim was dead by drawing his finger across his throat.

¶15  After the victim's death, Eftenoff told Tascha Boychuk, his daughter's counselor, that the victim was "the boss." The defendant admitted that they would argue about various issues, including money. He admitted that they argued about money either the day of or the day before the victim's death. Eftenoff also indicated that he was taught it was okay to hit tomboys and that the victim was a tomboy. At trial, he consistently denied he ever struck the victim.

¶16  The victim had been dead at least four hours when the medical personnel arrived. She had a bruise over her left cheek, a bloody nose, abrasions on her nose, a bruised lip, a laceration on her lip inside her mouth, and petechia around her right eye. She had a bruise on her right forearm, small abrasions on the back of her right hand, bruises and/or abrasions on several knuckles of both hands, and a bruise on her left thigh. The victim also had a bruise on the back of her head which went all the way through the scalp. This bruise was caused by a "significant blow," and could have resulted in a concussion and/or loss of consciousness, despite the lack of a skull fracture. The victim had bruising on both sides of her neck resulting from application of pressure. There was also bruising to internal tissues behind the larynx and on either side of the spinal column. The injuries to the victim's face, hands, arms, legs, and head were typical of those seen in scuffles. Some of these injuries could have been defensive injuries. The victim had no marks or bruises on her when Eftenoff's business assistant arrived at their home the morning of September 23 or when she saw her later that day.

\\\

\\\

\\\

- 3 -

¶17  Death was due to intra-cerebral hemorrhage due to cocaine intoxication. There were no findings of chronic cocaine use. Toxicological evidence indicated that, rather than multiple small doses over a long period of time, the victim had ingested one very large dose taken one to two hours before death. The dose was estimated at five hundred milligrams to one thousand milligrams. One thousand milligrams of cocaine would be fatal for a majority of people. Five hundred milligrams of cocaine would be fatal for approximately half the population, whether they had a tolerance or not. A medical expert testified that it was "extremely unlikely" that the victim died of a stroke unrelated to cocaine intoxication. An approximate time of death could not be determined.

¶18  Before the final autopsy report, toxicology report, or death certificate were made available to Eftenoff or the public, Eftenoff told various people that the victim used cocaine, had a "considerable amount" of cocaine in her system, and may have overdosed. Eftenoff also began to tell people, before any of the above reports were made available to Eftenoff or the public, that once the autopsy and toxicology reports were completed, he would be cleared of any wrongdoing. Approximately two weeks before these reports or any information within these reports were released, he told a co-worker of the victim that the autopsy report showed the victim died of a cocaine overdose and cleared him of all wrongdoing. [] There was contradictory evidence as to whether Eftenoff could have learned of the presence of cocaine in the victim's body or the contents of the various reports at any time before the reports were completed and officially made public.

¶20  After the victim's death, Eftenoff set aside various personal effects of the victim to send to her parents. These items were placed in a box for shipment. Evidence showed that various people, including Eftenoff, helped to pack the box. Many of the items had notes with them. The nanny and Eftenoff's assistant recognized Eftenoff's handwriting and identified the notes in the box as written by him. The parties stipulated that the defendant wrote the "major writings" in the box. Eftenoff showed the victim's best friend that he was sending the victim's parents a rolled-up one dollar bill used to snort cocaine. The box remained in his house for several days. Eftenoff's sister and assistant later took the box to a shipper.

¶21  On October 6, Eftenoff called the victim's mother twice, told her he had shipped a box, and asked if it had arrived. A few days later, he called her again to ask if the box had arrived. When she told him it had not, Eftenoff stated that the police possibly had it. The box arrived later that day. After the box was shipped, Eftenoff also asked the victim's brother if he knew about the box. Eftenoff asked him whether he knew if there were any drugs in the box. The brother denied any such knowledge. The defendant told the brother that someone told him drugs were in the box.

\\\

\\\

- 4 -

  ¶22 The victim's mother waited approximately two weeks to open the box once it arrived. Among many other items, the box contained the rolled-up one dollar bill, two short plastic straws, a purple pen cap, and a small bag containing just over one gram of cocaine. The box also contained a handwritten letter to "Grandma and Grandpa." A note in the box stated that everything in the box had a story to it. The victim's parents believed that Eftenoff was sending them a message that the victim used cocaine.

(Id., at 2-13.)

Petitioner thereafter filed a petition for post-conviction relief ("PCR") alleging three categories of newly discovered evidence Petitioner claimed merited relief: 1) evidence that would show that the trial testimony of toxicology expert Dr. Baselt included lies or testimony that was admitted in violation of the Frye/Daubert standard; 2) biological evidence regarding the structure of the veins in the victim's brain, and 3) evidence that the victim used excessive amounts of cocaine. (Doc. 1-2, at 57-58.) Petitioner asserted that the newly discovered evidence would "probably change the verdict," citing State v. Jeffers, 135 Ariz. 404 (Ariz. 1983). (Id., at 67.) Petitioner also alleged ineffective assistance of trial counsel for not pursuing an interlocutory appeal of the trial court's denial of Petitioner's motion to remand to the grand jury, and for not demanding a Frye/Daubert hearing regarding the substance of Dr. Baselt's testimony. (Id., at 70.)

An evidentiary hearing on the PCR petition was granted by the trial court, and commenced on June 6, 2005. (Doc. 17-2, at 96.) The hearing continued over eight (8) days, and 2 years. (Docs. 17-2 to 17-6.) During these hearings Petitioner called eight witnesses, five of whom possessed medical expertise, and were called to rebut the trial testimony of Dr. Baselt and his conclusion regarding the amount of cocaine in the victim's system and the use of the volume of distribution formula ("VOD") in making his calculations: Dr. Steven Karch (testified, as he had at trial, that it is not possible to accurately determine how much cocaine a person has ingested, and criticized further Dr. Baselt's use of the VOD calculation); Dr. William Hearn (testified that small amount of cocaine was found in victim's stomach and consistent with post-nasal drip of snorted cocaine, that there was no evidence to support the prosecution's theory that Petitioner forced cocaine down his wife's throat, and that the VOD formula was misapplied by Dr. Baselt); Dr. Archiaus Moseley (testified at trial and during

- 5 -

1 the evidentiary hearing that the amount of cocaine in the victim's stomach was small, and
2 that his opinion given during trial had changed as to this quantity); Dr. Joe Dressler (testified
3 that the total amount of cocaine in the victim's stomach was a small amount and that it would
4 be nearly impossible to administer cocaine orally to an unconscious person); Chief
5 Toxicologist Norman Wade (testified at trial and during the evidentiary hearing that cocaine
6 found in victim's stomach was not extremely high and an amount consistent with snorting
7 cocaine and that he disagreed with Baselt's conclusions and methods of determining the
8 amount of cocaine in a person's stomach). (Docs. 17-3 at 2-4, 77-78; 17-4 at 142-144; 17-5
9 at 66-67, 143-44; 1-4 at 29-52; 17-6 at 137-143.) Additionally, the prosecution called Dr.
10 Raymond Kelly to testify at the evidentiary hearing (testified that Dr. Baselt gave 35 bases
11 of opinion at trial, only five of which were based on the VOD calculation, and that he
12 believed that Dr. Baselt had used a scientifically valid method in reaching his opinion).
13 (Docs. 17-5 at 226-27; 17-6 at 109-110;141-42.)

14 After day three of the 8-day evidentiary hearing, on June 16, 2005, Petitioner's PCR
15 counsel filed a motion to amend the PCR petition to add a claim, pursuant to Ariz.R.Crim.P.
16 32.1, that he had demonstrated by "clear and convincing evidence that the facts underlying
17 the claim would be sufficient to establish that no reasonable fact-finder would have found
18 the defendant guilty of the underlying offense beyond a reasonable doubt." (Doc. 17-6, at
19 112.) There is no indication in the record that the trial judge ruled on the motion. In the
20 state's Closing Memorandum, it argued that, "it ha[d] become clear, during the prolonged
21 course of the[] post-conviction proceedings, that the Defendant has no newly discovered
22 evidence to present, . . . and that "[t]he array of witnesses that the Defendant paraded before
23 this Court merely presented testimony on the same information presented at trial." (Doc. 17-
24 6, at 142-43.) In PCR counsel's closing argument, she stated that "[r]egardless of what legal
25 theory is applied; newly discovered evidence, ineffective assistance of counsel, or actual
26 innocence, the fact remains that there was absolutely no evidence to support the
27 prosecution's theory that [Petitioner] forced his wife to swallow a single fatal dose of
28 cocaine," and that Dr. Baselt's conclusions were "completely invalid and without any

1  supporting evidence." (Doc. 1-4, at 39.) PCR counsel stressed that "the testimony heard
2  throughout the rule 32 hearings are one of laudable injustice. Wrongful convictions are a
3  perversion of Justice and an infection of evil without justification. This is most certainly a
4  case of wrongful conviction." (Doc. 1-4, at 52.)

5  The trial court ultimately ruled that, "for the reasons and arguments presented by the
6  State in its Closing Memorandum [], (1) Defendant's proposed evidence does not meet the
7  requirements of Rule 32 and therefore does not entitle Defendant to post-conviction relief,
8  (2) Defendant's proposed evidence does not qualify as newly-discovered evidence under
9  Rule 32 and therefore does not entitle Defendant to post-conviction relief, (3) Defendant is
10 not entitled to a Frye hearing, and (4) Defendant has failed to establish that he is entitled to
11 relief on a claim of ineffective assistance of counsel." (Doc. 1-4, at 53-54.) Petitioner,
12 through newly appointed counsel, filed a Motion to Reconsider the court's dismissal of his
13 PCR petition. (Id., at 57 - Doc. 1-5, at 5.) The trial court summarily denied the motion.
14 (Doc. 1-5, at 30.)

15 Petitioner filed a Petition for Review to the Arizona Supreme Court advancing three
16 arguments: (1) that the trial court abused its discretion when it refused to rule on the actual
17 innocence claim, which meant for all practical purposes that it had denied that claim; (2) the
18 scientific testimony offered at the post-conviction hearing constituted newly discovered
19 evidence; and, (3) the trial court was incorrect in holding that Petitioner was not entitled to
20 a Frye hearing. (Doc. 1-5, at 17-25.) On May 15, 2013, the Arizona Court of Appeals
21 summarily denied review. (Id., at 31.)

22 Petitioner raises seven (7) claims in his habeas petition, and concedes in his stay and
23 abey motion that claims 4a, 4c, 7a and 8b are unexhausted claims. (Doc. 25, at 3.) He moves
24 the court to stay and abey the habeas petition "pending resolution of his soon-to-be-filed state
25 post-conviction action." (Id.) Petitioner's claims 4a and 4c are "founded on the State's
26 presentation of false evidence against [Petitioner], in the grand jury and at trial." (Id., at 7.)
27 Claim 7a alleges ineffective assistance of counsel, based upon his trial counsel's failure to
28 investigate "pathology results that demonstrate [Petitioner]'s innocence." (Id.) Petitioner's

- 7 -

claim 8b alleges actual innocence. (Id., at 16.)

## STANDARD

Habeas relief is unavailable to a person in custody pursuant to a state court judgment, unless the applicant "has exhausted the remedies available in the courts of the State." 28 U.S.C. §2254(b)(1)(A). Generally, "a district court must dismiss habeas petitions containing both unexhausted and exhausted claims." Rose v. Lundy, 455 U.S. 509, 522 (1982). Subsequent to Rose, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposed a one-year statute of limitations for filing federal habeas corpus petitions. 28 U.S.C. §2254(d)(1). The Supreme Court recognizes that if a petitioner files a petition in federal court containing both exhausted and unexhausted claims, in other words a mixed petition, the combined effect of Rose and the statute of limitation could result in the loss of all claims, including those already exhausted, because the limitations period could expire while a petitioner returned to state court to present his unexhausted claims. Pliler v. Ford, 542 U.S. 225, 230-31 (2004). Thus, the Supreme Court has held that the district court has limited discretion to hold in abeyance a habeas petition containing both exhausted and unexhausted claims, to permit a petitioner to return to a state court to exhaust additional claims while the federal proceedings are stayed. Rhines v. Weber, 544 U.S. 269 (2005).

In Rhines, the Supreme Court held that a stay and abeyance is appropriate when (1) there is good cause for petitioner's failure to exhaust his claims first in state court; (2) the unexhausted claims are potentially meritorious; and, (3) there is no indication that the petitioner has engaged in intentionally dilatory litigation tactics. 544 U.S. at 277-78. "[E]ven if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Id. The stay-and-abeyance procedure "should be available only in limited circumstances," consistent with AEDPA's twin purposes: "reduc[ing] delays in the execution of state and federal criminal sentences" and encouraging petitioners to seek relief from state courts in the first instance. Rhines, 544 U.S. at 276-77. "Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only

1 appropriate when the district court determines there was good cause for the petitioner's
2 failure to exhaust his claims first in state court. Id.

3 To establish good cause under Rhines, the Petitioner must set forth "a reasonable
4 excuse, supported by sufficient evidence, to justify that failure," and that a "showing of state
5 post-conviction [ineffective assistance of counsel] satisfies the [] good cause standard."
6 Blake v. Baker, 745 F.3d 977, 982 (9th Cir. 2014). The standard for determining good cause
7 is not any more demanding that the cause standard as articulated in Martinez v. Ryan, 132
8 S.Ct. 1309 (2012). Id., at 984. In Blake, the court held that ineffective assistance (IAC) of
9 PCR counsel was good cause, when he "failed to conduct any independent investigation or
10 retain experts in order to discover the facts underlying his trial-counsel IAC claim;" that
11 Blake had suffered severe abuse as a child and suffered from brain damage and psychological
12 disorders. Id., at 982.

13 As to a claim of actual innocence, 28 U.S.C. §2254(d)(1) provides that habeas relief
14 may be granted on an adjudicated state prisoner's claim only if the state court's decision was
15 "contrary to, or involved an unreasonable application of, clearly established Federal law, as
16 determined by the Supreme Court of the United States." The Supreme Court has not yet
17 recognized actual innocence as a grounds for habeas relief absent an independent
18 constitutional violation occurring in the underlying state criminal proceedings. See Herrera
19 v. Collins, 506 U.S. 390, 400-401 (1993). The Ninth Circuit Court of Appeals has noted that
20 a majority of the Justices in Herrera would have supported a claim of free-standing
21 innocence, and that "a habeas petitioner asserting a freestanding innocence claim must go
22 beyond demonstrating doubt about his guilt, and must affirmatively prove he is probably
23 innocent." Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000) (evidence that is
24 subject to conflicting interpretation does not make the "required showing of probable
25 innocence"). See also, Carriger v. Stewart, 132 F.3d 463, 477 (9th Cir. 1997) (court rejected
26 freestanding actual innocence claim, noting that petitioner had "presented no evidence, for
27 example, demonstrating he was elsewhere at the time of the murder, nor [was] there any new
28 and reliable physical evidence, such as DNA, that would preclude the possibility of guilt.");

Jones v. Taylor, 763 F.3d 1242, 1251 (9th Cir. 2014) ("The most that can be said of the new testimony is that it undercuts the evidence presented at trial. Evidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence.").

An actual-innocence federal habeas claim that is procedurally defaulted, or raised after the expiration of the AEDPA statute of limitations, may be heard, if Petitioner "persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin v. Perkins, 133 S.Ct. 1924, 1928 (2013) (citing Schlup v. Delo, 513 U.S. 298 (1995)). The court should "count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." Id.

## CLAIMS

A. Claim 4a: Violation of Petitioner's Due Process Rights: Presentation of False Evidence in the Grand Jury. (Docs. 1, at 24; 24, at 23.)

Petitioner claims that the only witness in the grand jury, Detective Petrosino, "gave false and intentionally misleading evidence on the issues most central to the indictment, including cause of death." (Doc. 25, at 12.) The falsehoods most prejudicial are identified as "(a) that within just one-third of [the murder victim]'s stomach contents there were 41 mg of undigested cocaine [], when there were actually fewer than 3 mg total of undigested cocaine in [her] stomach, an amount consistent with snorting cocaine, [], which Petrosino admitted [the victim] was known to do, [], and (b) that the subarachnoid hemorrhage that caused her death was consistent with being caused by the traumatic injury to the back of her head, [], when it is not at all, according to the State's witnesses, []." (Id., at 12-13) (emphasis and record citations omitted).

Before trial, Petitioner's counsel filed a motion to remand to the grand jury, claiming that Petitioner was denied a substantial procedural right in that Detective Petrosino mislead the grand jury as to the cause of death by suggesting that the cause of death was domestic violence. (Doc. 16-1, at 38-47.) The state, in its response, reference the grand jury record

1 which demonstrated that the grand jury was informed that the medical examiner could not
2 say with "one hundred percent certainty" the manner in which the victim died. (Id., at 62.)
3 The trial court denied relief, finding that "[c]ontrary to Defendant's contention, the jurors
4 were told that the cause of death was cocaine intoxication on this claim," citing extensively
5 to the grand jury transcripts. (Id., at 152-53.) Because the trial court's denial of the motion
6 to remand was an issue that could have been raised on appeal, and was not, this issue would
7 be precluded in collateral proceedings, pursuant to Arizona Rules of Criminal Procedure
8 32.2(1) and (3). (Doc. 1-1, at 3)

9       The second sub-part of Petitioner's claim is that Detective Petrosino lied before the
10 Grand Jury when he testified that toxicology reports indicated that within just one-third of
11 victim's stomach contents was found 41 mg of undigested cocaine. Petitioner did not raise
12 this issue during trial or on appeal, and would thus be precluded therefore from raising the
13 issue in PCR proceedings. Petitioner argues IAC of his PCR counsel as good cause for failing
14 to exhaust this claim. Petitioner has not demonstrated that his claim is potentially
15 meritorious.

16       "A trial court has no power to inquire into or weigh the legal sufficiency of the
17 evidence presented to the grand jury. . . ." State ex rel. Preimsberg v. Rosenblatt, 543 P.2d
18 773, 774 (Ariz. 1975). Rather, "the weight and sufficiency of the evidence for indictment
19 is a decision [that] history and Constitution leave to the judgment of the citizens chosen to
20 serve as members of the grand jury." Id. Due process is violated, however, if the
21 government bases an indictment partially on perjured testimony, when the perjured testimony
22 is material, and when jeopardy has not attached. State v. Moody, 94 P.3d 1119, 1134 (Ariz.
23 2004) (citation omitted). Petitioner does not establish that the testimony of Detective
24 Petrosino was false, or, in any event, that the claimed perjured testimony was material. The
25 trial judge noted that the grand jury was given the correct cause of death information, and the
26 issue of the victim's cocaine intoxication was debated by the experts, and Petitioner
27 presented no complete refutation of Dr. Baselt's testimony. Thus Petitioner's claims relating
28 to Detective Petrosino's testimony before the grand jury are not potentially meritorious. As

such, Petitioner also does not demonstrate IAC of PCR counsel as cause for not raising the claim in PCR proceedings.

B. Claim 4c: State's key witness, Dr. Baselt, testified falsely, and misrepresented to the jury that the VOD formula he had used was scientifically valid and applicable and that an error rate of 30% was appropriate.

Petitioner did not raise this claim on appeal or in his PCR petition, and thus would be precluded from raising it in a successive petition pursuant to Ariz.R.Crim.P. 32.2(1) and (3) Additionally, Petitioner fails to present evidence in support of this claim. Petitioner extensively cross-examined Dr. Baselt during trial regarding the validity of the VOD formula and his calculations. (Doc. 16, at 116.) Toxicologist Norman Wade, and Dr. Steven Karch testified at trial and disputed Dr. Baselt's use of the VOD formula postmortem, and thus, the jury was presented with evidence of a disagreement in the scientific community. (Id.) During Petitioner's PCR hearing, he called Mr. Wade and Dr. Karch to testify, as well as several other witnesses who also criticized Dr. Baselt's methods and testimony, and the trial judge did not find that the testimony relating to Dr. Baselt's trial opinions merited post-conviction relief. Thus, Petitioner has not demonstrated that this claim is potentially meritorious. As such, Petitioner also does not demonstrate IAC of PCR counsel as cause for not raising the claim in PCR proceedings.

C. Claim 7a: Petitioner's trial counsel was ineffective for failing to consult with an independent pathologist to prove that the internal bruises on the victim's neck were not in fact bruises, and that forced swallowing is impossible in unconscious people.

Petitioner did not raise this claim in his PCR petition, and he would therefore be precluded from bringing the claim in a successive petition pursuant to Ariz.R.Crim.P. 32.2(1) and (3) and 32.4. Even if Petitioner could establish, that his PCR counsel was ineffective in not raising the claim, and that the trial court should allow the claim to go forward, Petitioner does not demonstrate prejudice, pursuant to Strickland v. Washington, 466 U.S. 668 (1984), as a result of any error by trial counsel.

Petitioner called Dr. Dressler, a pathologist, to testify during the PCR proceedings. Dr. Dressler did not testify that the bruises on the victim's neck were not in fact bruises, only that additional testing could have been done to confirm the findings of the state's experts.

- 12 -

1  (Doc. 17-3, at 28-32.)  Also, during the hearing Petitioner called Dr. Moseley, who had
2  performed the autopsy on the victim along with Dr. Keen, and who had previously testified
3  at trial.  Dr. Moseley testified that he did not observe "strap muscle hemorrhages" which he
4  would expect to see if someone's neck had been traumatized, but did note that there was a
5  traumatic injury to the victim's body and that there was a large amount of cocaine within her
6  system, but that the question was, "due to what?"  (Doc. 17-5, at 73-76, 90-91, 108-09.)  Dr.
7  Dressler also testified in the PCR hearing that pouring 4.2 liters of a liquid down an
8  unconscious person would be impossible "unless you put a hose down their esophagus and
9  pumped it into their stomach and then pulled the hose out."  (Doc. 17-3, at 33-34.)  He also
10 acknowledged, however that he is not a toxicologist and that he is "deficient" in the area of
11 "postmortem redistribution of cocaine in a body."  (Id., at 20.)

12    None of the experts who testified at trial would opine how the cocaine was introduced
13 into the victim's system, nor definitely opine that cocaine was not forced down the victim's
14 throat, such that this PCR testimony was directly contradictory or conclusively refuted the
15 trial testimony of the state's witnesses.  (Doc. 16, at 63-64.)  Furthermore, the judge who
16 presided over the PCR proceedings (the same judge who presided over the trial) considered
17 this "new" evidence, and found that it did not qualify as newly discovered evidence under
18 Ariz.R.Crim.P. 32.1(e), that probably would have changed the verdict or sentence, and that
19 it did not merit post-conviction relief.  Petitioner does not demonstrate that this claim is
20 potentially meritorious.

21 D.    Claim 8b: Actual Innocence.

22    Petitioner asserts that PCR counsel "abdicated defense of [Petitioner]'s due process
23 rights by failing to recognize that the newly discovered evidence claim she presented
24 contained all or nearly all the facts necessary to make the powerful constitutional claims
25 [Petitioner] now seeks to present to state court at a lesser, more easily met standard than the
26 newly discovered evidence."  (Doc. 25, at 7) (emphasis omitted).  Petitioner additionally
27 asserts that the facts underlying each claim provides "clear and convincing evidence that
28 [Petitioner] is innocent," and that the failure of PCR counsel to "connect evidence of actual

- 13 -

1 innocence to obvious constitutional claims that are stronger than a 'newly discovered
2 evidence' state claim and would preserve the issues for federal review surely must be
3 constitutionally deficient assistance of counsel." (Id., at 8.) Although Petitioner cites to the
4 record in noting that PCR counsel failed to present rebuttal evidence, (Doc. 31, at 6),
5 Petitioner does not explain what additional evidence she failed to present in PCR proceedings
6 or how such failure prejudiced Petitioner.

7 Respondent argues that the facts Petitioner cites in support of his actual innocence
8 claim are the same facts that were presented to support Petitioner's PCR claim of newly
9 discovered evidence. Petitioner's counsel argued to the trial court during the PCR
10 proceedings that the facts demonstrated Petitioner's innocence, and the state argued that the
11 facts were merely impeaching and concerned the same evidence already presented during the
12 trial. The state court judge hearing the evidence, the same judge who presided over the trial,
13 after hearing the numerous experts presented by Petitioner over the course of several days,
14 found that proposed evidence did not (1) meet the requirements of Rule 32; (2) did not
15 qualify as newly discovered evidence; (3) did not demonstrate that Petitioner was entitled to
16 a Frye hearing; and, (4) did not demonstrate ineffective assistance of counsel.

17 In finding that Petitioner's claims did not meet the requirements of Rule 32, the trial
18 court necessarily found that an actual innocence claim was not established pursuant to
19 Ariz.R.Crim.P. 32.1(h) ("[t]he defendant demonstrates by clear and convincing evidence that
20 the facts underlying the claim would be sufficient to establish that no reasonable fact-finder
21 would have found defendant guilty of the underlying offense beyond a reasonable doubt ...").
22 Thus, this claim would be precluded from relief by the trial court as having been previously
23 presented in a collateral proceeding. Ariz.R.Crim.P. 32.2(a). Even if the trial court's ruling
24 is unclear[1] as to whether or not the trial court decided the claim of factual innocence,
25 Petitioner's claim would still not be cognizable in a successive petition, because Petitioner

---

[1] Petitioner cites State v. Hill, in support of his assertion that his motion to amend should be considered as denied. 848 P.2d 1375, 1385 (1993) ("motions not expressly ruled upon are deemed denied by operation of law").

- 14 -

has no new evidence to present than was previously presented to the trial court. See State v. Mata, 916 P.2d 1035, 1078 (Ariz. 1996) (defendant was precluded from newly discovered evidence claim which he had presented, "in varying degrees," on at least four prior occasions). Here, Petitioner asserts the right to return to state court to present the same evidence to support a claim of actual innocence.

On the last day of the 8-days of testimony in the PCR proceedings, the trial court made clear its view that Petitioner's evidence was cumulative as to what had been presented at trial:

> [T]he cases say newly discovered evidence does not include evidence that is merely cumulative or impeaching.
> Now, one of my, one of my preliminary assessments of this case and all the evidence so far, one way it can be characterized as Dr. Baselt testified as he testified on the record and Dr. Karch testified. Dr. Karch did not agree with Dr. Baselt.
> Now, to the extent we get a witness that comes in and says, I agree with Dr. Karch and therefore I disagree with Dr. Baselt, we now have testimony that is essentially cumulative to Dr. Karch and impeaching Dr. Baselt. When we get a witness that comes in and says, I agree with Dr. Baselt and I disagree with Dr. Karch, we are having testimony that is cumulative to one and impeaching the other.

(Doc. 17-6, at 96-97)

> One thing I remember from Dr. Karch's testimony, when he was testifying I noticed quite a number of time he said, and my opinion is, and everyone else in the scientific community agrees with me, and my opinion is thus and so. He said that several times. You know, if one person is going to say it, okay, one person is going to say it. I don't know if we need seven people to say it.

(Id., at 98)

In continuing discussion with the parties concerning the cumulative nature of the evidence presented relating to the disagreement expressed by the medical experts during the trial, and concerning whether or not the testimony of the state's experts should have been subject to a Frye/Daubert hearing, the trial court continued:

> But the thing is you did have Dr. Karch. And as I remember, Dr. Karch disagreed with Dr. Baselt. And he said, it's invalid to use the volume of distribution, that's not proper, that's not valid, that's not scientifically accepted.
>
> You know, one of the underlying bases to me for the *Logerquist* opinion is – it was written by Justice Feldman. It was Justice Feldman's belief, joined by however you want to characterize the other justices, that jurors are – you know, have a certain level of intelligence. And I think part of it was – it's sort of this, this thought that judges are being a little bit egotistical and thinking

- 15 -

>that they are such great intellects that they have such a great command of knowledge and that jurors are such ignorant or unthinking people that they are never going to pick up on this.
>
>I think his view was, the way we litigate cases, if there are disputes, we present the disputes to the jurors and they sort them out. And that it has to be pretty extreme for the judge to say, oh, this stuff is so prejudicial and incorrect and misleading that we won't even let the jurors think about it because they are so limited in their ability that they would never be able to sort it out., ... judges should not use evidentiary rules to bootstrap themselves into the jury box.

(Id., at 101-102)

It is clear by the record that the trial court's denial of Petitioner relief pursuant to Ariz.R.Crim.P. 32 was based upon the trial court's view, as argued by the state, that Petitioner merely presented testimony cumulative to the same information presented at trial. Whether the standard upon further post-conviction review is 'evidence that would probably change the verdict,' 'actual prejudice due to ineffective assistance,' or 'evidence establishing that no reasonable fact-finder would have found Petitioner guilty beyond a reasonable doubt,' the trial court made clear that the evidence was simply not sufficient to support post-conviction relief.

Petitioner has not provided any new evidence in his habeas pleadings to support his claim of actual innocence, other than what was already presented to the trial court in the PCR proceedings. The dispute over method of calculating the amount of cocaine in the victim's system,[2] and the question of how the cocaine was introduced into the victim's system (Dr. Baselt did not form an opinion as to how the cocaine was introduced) does not detract from the other incriminating evidence presented at trial that the victim had suffered an unnatural death and the evidence of Petitioner's knowledge and culpability. Thus, Petitioner is not likely to prevail on the merits, even if the trial court were to permit the claim in a successive petition.

---

[2]Dr. Baselt testified at trial that the victim had ingested between 500 milligrams and 1 gram of cocaine within one or two hours of her death. (RT 3/5/2001, at 102, 114) The state's expert, Dr. Kelly, testified during the PCR proceedings that, just analyzing the cocaine in the victim's blood, he calculated that the victim had taken in 117 milligrams of cocaine, and 372 milligrams taking into account other factors. (Doc. 17-6, at 59-62.)

- 16 -

Petitioner also argues that Petitioner's PCR counsel provided deficient performance as evidenced by her involvement in state bar disciplinary proceedings during PCR proceedings (relating to her personal involvement with another client), and her representations to the trial court in her motion to withdraw, filed after the trial court's PCR decision (noting dissolution of her firm and downturn in her practice). (Doc. 25, at 6-7.) Petitioner does not demonstrate that the disciplinary proceedings against Petitioner's counsel, in another case, and involving ethical issues as opposed to competence issues, affected PCR counsel's performance in Petitioner's case. See United States v. Nickerson, 556 F.3d 1014, 1019 (9th Cir. 2009) ("an attorney's violation of a rule of ethics or professional conduct before trial does not constitute per se ineffective assistance of counsel"). Petitioner likewise does not establish that the change in Petitioner's law firm or downturn in her practice led to deficient performance.

Petitioner also cites State v. Bennett, 146 P.3d 63 (2006), for the proposition that he can file his claims in a successive petition and avoid preclusion under Rule 32.2(b) by arguing that PCR counsel could not allege her own ineffectiveness. Bennett's limited holding was that PCR counsel could not raise a legitimate claim of ineffective assistance of appellate counsel if appellate and PCR counsel were one and the same (as in the case here). As set forth above, the claims Petitioner asserts appellate counsel should have raised are unexhausted and without merit. Additionally, assuming arguendo, that PCR counsel was ineffective by not properly presenting an actual innocence claim, that counsel withdrew after the trial court ruling, and new PCR counsel was appointed. (Doc. 1-4, at 55; Doc. 17-6, at 145.) Petitioner does not address second PCR counsel's failure to file a successive PCR petition, pursuant to Ariz.R.Crim.P. 32.1(h), asserting Petitioner's actual innocence, or why she did not file a successive PCR petition alleging ineffective assistance of counsel, on the authority of Bennett.

## CONCLUSION

Petitioner's claims are unexhausted, and he would be precluded from bringing them in a successive petition pursuant to Ariz.R.Crim.P. 32.2. Petitioner does not demonstrate

- 17 -

good cause for his failure to exhaust his claims, or that the unexhausted claims are potentially meritorious. Staying this action and permitting Petitioner to return to case to essentially re-litigate what was litigated over the course of two years in state court is not compelled under Rhines, and is not consistent with one of the AEDPA's twin purposes, that of reducing delays in the execution of state and federal criminal sentences. Thus, the Court will recommend that Petitioner's Motion to Stay and Abey be denied.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Motion to Stay and Abey Habeas Proceedings. (Doc. 25) be **DENIED**.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

DATED this 10th day of March, 2015.

Michelle H. Burns
United States Magistrate Judge