1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Brian Thomas Eftenoff,              )   No. CV 14-01023-PHX-NVW(MHB)
                                        )
10                 Petitioner,          )   **REPORT AND RECOMMENDATION**
                                        )
11  vs.                                 )
                                        )
12                                      )
    Charles L Ryan, et al.,             )
13                                      )
                                        )
14                 Respondents.         )
    _____

15

16  TO THE HONORABLE NEIL V. WAKE, UNITED STATES DISTRICT JUDGE:

17          On May 12, 2014, Petitioner Brian Thomas Eftenoff, who is confined in the Arizona

18  State Prison Complex, Red Rock Unit, Eloy, Arizona, filed a *pro se* Petition for Writ of

19  Habeas Corpus (hereinafter "habeas petition") pursuant to 28 U.S.C. § 2254 (Doc. 1).  On

20  October 20, 2014, a Notice of Appearance on Petitioner's behalf was filed by attorney Lee

21  Phillips of the Arizona Innocence Project, along with a Motion to Amend Petition for Writ

22  of Habeas Corpus.  (Docs. 14, 15.)   Respondents filed their Answer to Petitioner's habeas

23  petition on October 21, 2014.  (Doc. 16.)  This Court denied Petitioner's motion to amend

24  on October 27, 2014, ordering that Petitioner would be allowed to "clarify and amplify

25  Petitioner's habeas claims in his Reply," and that the Court may "permit further pleadings

26  by the parties to address any clarification and amplification of claims." (Doc. 21 at 3-4.) On

27  December 22, 2014, Petitioner filed his Reply, and simultaneously, a Motion to Stay and

28  Abey Habeas Proceedings (hereinafter "stay and abey motion").  (Docs. 24, 25.)

On February 10, 2015, this Court permitted Respondents to file a supplemental habeas answer, to address any matters newly raised in Petitioner's Reply, within fourteen (14) days after the Court's ruling on Petitioner's stay and abey motion. (Docs. 32-34.) On March 10, 2015, this Court filed a Report and Recommendation, recommending that Petitioner's stay and abey motion be denied. (Doc. 35.) On April 28, 2015, the (presiding) Court adopted the recommendation to deny the motion. (Doc. 40.) Respondents thereafter, on June 11, 2015, filed a Supplemental Answer to Petition for Habeas Corpus ("supplemental answer") (Doc. 43), and on July 30, 2015, Petitioner filed his Supplemental Reply ("supplemental reply") (Doc. 46).

## BACKGROUND

Petitioner was indicted on one count of murder in the second degree, a class one felony for the September 23, 1999, death of his wife Judi Eftenoff and one count of transfer of narcotic drugs, a class 2 felony for sending cocaine to his in-laws on or between October 8 and 13, 1999. (Doc. 16 at 9.) Petitioner was convicted at trial on both counts. On appeal he raised the following issues: (1) failure to sever counts; (2) failure to conduct severance hearing; (3) failure to grant directed verdict; (4) failure to conduct competency of minor to testify hearing; (5) prosecutorial misconduct in implying existence of non-existent evidence; (6) failure to conduct mandatory voluntariness hearing; (7) juror misconduct; (8) failure to exclude witness; (9) improper other bad acts testimony; and, (10) failure to grant mistrial/new trial. (Doc. 1-1 at 3.) Petitioner's conviction and sentence were later affirmed on appeal. (Doc. 17-2 at 2.) The Arizona Court of Appeals summarized the facts supporting Petitioner's convictions and sentences as follows:

> ¶1    . . . The defendant was charged with second degree murder following the death of his wife. The medical examiner attributed the death to an intra-cerebral hemorrhage due to cocaine intoxication. Eftenoff was also charged with transfer of narcotic drugs after he shipped a box of the victim's personal effects to his in-laws. Among other items, the box contained cocaine and a note which stated everything in the box had a story.

> ¶12    The victim died sometime during the night of September 23-24, 1999. A neighbor saw the victim returning from her mailbox between 9:00 and 10:00 p.m. on September 23 and she appeared normal. A friend

came to Eftenoff's home the evening of September at approximately 9:30 and was there one-half to one hour before he and Eftenoff left, eventually going to a casino. The friend never saw the victim when he was at the defendant's home. Video from the casino showed Eftenoff and his friend going into the casino at 11:43 p.m. on September 23, 1999, changing a tire in the casino parking lot, and staying until approximately 5:20 a.m. that morning. Whenever his friend ran out of money, Eftenoff gave him more so they could continue to gamble. If the defendant had not continued to give him money, his friend would have asked to leave the casino. After they returned to Eftenoff's home, his friend used the telephone in Eftenoff's home office and left. He never saw the victim. The friend admitted that he had used cocaine with the defendant and the victim in the past and that either he or Eftenoff had supplied the cocaine used.

¶13    A live-in nanny helped take care of the Eftenoff's two children. She was out the evening of September 23 and did not return to the residence until approximately 1:00 a.m. on September 24. She did not see the victim or Eftenoff that evening. She awoke later that morning to the sound of Eftenoff yelling and pounding on her bedroom door. Eftenoff testified that after his friend left the house after their night at the casino, he went to the master bath and found the victim on the floor. He told the nanny that the victim was injured, and asked if she heard anything or knew what was going on. Eftenoff then took his daughter to his son's bedroom, turned on the television, and closed the door. The nanny followed him into the master bedroom, where she saw the victim on the floor of the bathroom. The defendant had already called the 911 operator, who was still on the line.

¶14    Eftenoff pointed out bruises on the victim's thigh and arm to the nanny. He told her that someone must have come in the house and hurt the victim and that something must have happened. The defendant then attempted CPR. Later, while the nanny was speaking to a police officer at the home, Eftenoff signaled to her that the victim was dead by drawing his finger across his throat.

¶15    After the victim's death, Eftenoff told Tascha Boychuk, his daughter's counselor, that the victim was "the boss." The defendant admitted that they would argue about various issues, including money. He admitted that they argued about money either the day of or the day before the victim's death. Eftenoff also indicated that he was taught it was okay to hit tomboys and that the victim was a tomboy. At trial, he consistently denied he ever struck the victim.

¶16    The victim had been dead at least four hours when the medical personnel arrived. She had a bruise over her left cheek, a bloody nose, abrasions on her nose, a bruised lip, a laceration on her lip inside her mouth, and petechia around her right eye. She had a bruise on her right forearm, small abrasions on the back of her right hand, bruises and/or abrasions on several knuckles of both hands, and a bruise on her left thigh. The victim also had a bruise on the back of her head which went all the way through the scalp. This bruise was caused by a "significant blow," and could have resulted in a concussion and/or loss of consciousness, despite the lack of a skull fracture. The victim had bruising on both sides of her neck resulting from application of

pressure.  There was also bruising to internal tissues behind the larynx and on either side of the spinal column.  The injuries to the victim's face, hands, arms, legs, and head were typical of those seen in scuffles.  Some of these injuries could have been defensive injuries.  The victim had no marks or bruises on her when Eftenoff's business assistant arrived at their home the morning of September 23 or when she saw her later that day.

¶17    Death was due to intra-cerebral hemorrhage due to cocaine intoxication.  There were no findings of chronic cocaine use.  Toxicological evidence indicated that, rather than multiple small doses over a long period of time, the victim had ingested one very large dose taken one to two hours before death.  The dose was estimated at five hundred milligrams to one thousand milligrams.  One thousand milligrams of cocaine would be fatal for a majority of people.  Five hundred milligrams of cocaine would be fatal for approximately half the population, whether they had a tolerance or not.  A medical expert testified that it was "extremely unlikely" that the victim died of a stroke unrelated to cocaine intoxication.  An approximate time of death could not be determined.

¶18    Before the final autopsy report, toxicology report, or death certificate were made available to Eftenoff or the public, Eftenoff told various people that the victim used cocaine, had a "considerable amount" of cocaine in her system, and may have overdosed.  Eftenoff also began to tell people, before any of the above reports were made available to Eftenoff or the public, that once the autopsy and toxicology reports were completed, he would be cleared of any wrongdoing.  Approximately two weeks before these reports or any information within these reports were released, he told a co-worker of the victim that the autopsy report showed the victim died of a cocaine overdose and cleared him of all wrongdoing.  [] There was contradictory evidence as to whether Eftenoff could have learned of the presence of cocaine in the victim's body or the contents of the various reports at any time before the reports were completed and officially made public.

¶20    After the victim's death, Eftenoff set aside various personal effects of the victim to send to her parents.  These items were placed in a box for shipment.  Evidence showed that various people, including Eftenoff, helped to pack the box.  Many of the items had notes with them.  The nanny and Eftenoff's assistant recognized Eftenoff's handwriting and identified the notes in the box as written by him.  The parties stipulated that the defendant wrote the "major writings" in the box.  Eftenoff showed the victim's best friend that he was sending the victim's parents a rolled-up one dollar bill used to snort cocaine.  The box remained in his house for several days.  Eftenoff's sister and assistant later took the box to a shipper.

¶21    On October 6, Eftenoff called the victim's mother twice, told her he had shipped a box, and asked if it had arrived.  A few days later, he called her again to ask if the box had arrived.  When she told him it had not, Eftenoff stated that the police possibly had it.  The box arrived later that day.  After the box was shipped, Eftenoff also asked the victim's brother if he knew about the box.  Eftenoff asked him whether he knew

if there were any drugs in the box.  The brother denied any such knowledge.  The defendant told the brother that someone told him drugs were in the box.

¶22   The victim's mother waited approximately two weeks to open the box once it arrived.  Among many other items, the box contained the rolled-up one dollar bill, two short plastic straws, a purple pen cap, and a small bag containing just over one gram of cocaine.  The box also contained a handwritten letter to "Grandma and Grandpa."   A note in the box stated that everything in the box had a story to it.  The victim's parents believed that Eftenoff was sending them a message that the victim used cocaine.

(Id. at 2-13.)

Petitioner thereafter, through counsel, on December 15, 2003, filed a petition for post-conviction relief ("PCR") alleging three categories of newly discovered evidence Petitioner claimed merited relief:  1) evidence that would show that the trial testimony of toxicology expert Dr. Baselt included lies or testimony that was admitted in violation of the Frye/Daubert standard; 2) biological evidence regarding the structure of the veins in the victim's brain, and 3) evidence that the victim used excessive amounts of cocaine. (Doc. 1-2 at 57-58.)  Petitioner asserted that the newly discovered evidence would  "probably change the verdict," citing State v. Jeffers, 135 Ariz. 404; 661 P.2d 1105 (Ariz. 1983).  (Id. at 67.) Petitioner also alleged ineffective assistance of trial counsel for not pursuing an interlocutory appeal of the trial court's denial of Petitioner's motion to remand to the grand jury, and for not demanding a Frye/Daubert hearing regarding the substance of Dr. Baselt's testimony. (Id. at 70.)

An evidentiary hearing on the PCR petition was granted by the trial court, and commenced on June 6, 2005.  (Doc. 17-2 at 96.)  The hearing continued over eight (8) days, and 2 years.  (Docs. 17-2 to 17-6.)  During these hearings Petitioner called eight witnesses, five of whom possessed medical expertise, and were called to rebut the trial testimony of Dr. Baselt and his conclusion regarding the amount of cocaine in the victim's system and the use of the volume of distribution formula ("VOD") in making his calculations: Dr. Steven Karch (testified, as he had at trial, that it is not possible to accurately determine how much cocaine a person has ingested, and criticized further Dr. Baselt's use of the VOD calculation); Dr. William Hearn (testified that small amount of cocaine was found in victim's stomach and

consistent with post-nasal drip of snorted cocaine, that there was no evidence to support the prosecution's theory that Petitioner forced cocaine down his wife's throat, and that the VOD formula was misapplied by Dr. Baselt); Dr. Archiaus Moseley (testified at trial and during the evidentiary hearing that the amount of cocaine in the victim's stomach was small, and that his opinion given during trial had changed as to this quantity); Dr. Joe Dressler (testified that the total amount of cocaine in the victim's stomach was a small amount and that it would be nearly impossible to administer cocaine orally to an unconscious person); Chief Toxicologist Norman Wade (testified at trial and during the evidentiary hearing that cocaine found in victim's stomach was not extremely high and an amount consistent with snorting cocaine and that he disagreed with Baselt's conclusions and methods of determining the amount of cocaine in a person's stomach). (Docs. 17-3 at 2-4, 77-78; 17-4 at 142-144; 17-5 at 66-67, 143-44; 1-4 at 29-52; 17-6 at 137-143.) Additionally, the prosecution called Dr. Raymond Kelly to testify at the evidentiary hearing (testified that Dr. Baselt gave 35 bases of opinion at trial, only five of which were based on the VOD calculation, and that he believed that Dr. Baselt had used a scientifically valid method in reaching his opinion). (Docs. 17-5 at 226-27; 17-6 at 109-110;141-42.)

After day three of the 8-day evidentiary hearing, on June 16, 2005, Petitioner's PCR counsel filed a motion to amend the PCR petition to add a claim, pursuant to Ariz.R.Crim.P. 32.1, that he had demonstrated by "clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found the defendant guilty of the underlying offense beyond a reasonable doubt." (Doc. 17-6 at 112.) This one paragraph assertion was not supported by any further argument or evidence. There is no indication in the record that the trial judge ruled on the motion. After the PCR hearings were concluded, in the State's Closing Memorandum, it argued that, "it ha[d] become clear, during the prolonged course of the[] post-conviction proceedings, that the Defendant has no newly discovered evidence to present, . . . and that [t]he array of witnesses that the Defendant paraded before this Court merely presented testimony on the same information presented at trial." (Doc. 17-6 at 142-43.) In PCR counsel's closing argument,

1  she stated that "[r]egardless of what legal theory is applied; newly discovered evidence,
2  ineffective assistance of counsel, or actual innocence, the fact remains that there was
3  absolutely no evidence to support the prosecution's theory that [Petitioner] forced his wife
4  to swallow a single fatal dose of cocaine," and that Dr. Baselt's conclusions were
5  "completely invalid and without any supporting evidence." (Doc. 1-4 at 39.) PCR counsel
6  stressed that "the testimony heard throughout the rule 32 hearings are one of laudable
7  injustice.  Wrongful convictions are a perversion of Justice and an infection of evil without
8  justification.  This is most certainly a case of wrongful conviction." (Doc. 1-4 at 52.)

9        The trial court ultimately ruled, on September 30, 2009, that, "for the reasons and
10  arguments presented by the State in its Closing Memorandum [], (1) Defendant's proposed
11  evidence does not meet the requirements of Rule 32 and therefore does not entitle Defendant
12  to post-conviction relief, (2) Defendant's proposed evidence does not qualify as newly-
13  discovered evidence under Rule 32 and therefore does not entitle Defendant to post-
14  conviction relief, (3) Defendant is not entitled to a *Frye* hearing, and (4) Defendant has failed
15  to establish that he is entitled to relief on a claim of ineffective assistance of counsel." (Doc.
16  1-4, at 53-54.)  Petitioner, through newly appointed counsel, filed a Motion to Reconsider
17  the court's dismissal of his PCR petition, arguing in part that the trial court did not address
18  Petitioner's motion to amend his PCR petition.  (Id. at 57 to Doc. 1-5 at 5.)  The trial court
19  summarily denied the motion.  (Doc. 1-5 at 30.)

20        Petitioner filed a Petition for Review to the Arizona Supreme Court advancing three
21  arguments: (1) the trial court abused its discretion when it refused to rule on the actual
22  innocence claim, which meant for all practical purposes that it had denied that claim; (2) the
23  scientific testimony offered at the post-conviction hearing constituted newly discovered
24  evidence; and, (3) the trial court was incorrect in holding that Petitioner was not entitled to
25  a Frye hearing.  (Doc. 1-5 at 6-30.)  On May 15, 2013, the Arizona Court of Appeals
26  summarily denied review.  (Id. at 31.)

27        Petitioner filed his *pro se* habeas petition on May 12, 2014, raising 19 claims.
28  Petitioner conceded in his subsequently filed (and by then counseled) stay and abey motion

that Claims 4a, 4c, 7a and 8b are unexhausted claims.  (Docs. 25 at 3; 24 at 4.)  The Court denied Petitioner's stay and abey motion on April 28, 2015.  (Doc. 40.)  In his Reply, Petitioner maintains seven claims for habeas relief - withdrawing all other claims raised in his habeas petition.  (Doc. 24 at 23-25.)  Petitioner's claims are described by Petitioner are as follows:

- **Claim 4a: Presentation of false evidence in the grand jury violating** Petitioner's due process rights, when the sole witness lied to and misled the grand jury who indicted Petition on false charges.  (Doc. 1, at 24; 24, at 23.)  Petitioner cites Napue v. Illinois, 360 U.S. 264, 271 (1959); United States v. Young, 17 F.3d 1201, 11203 (9th Cir. 1994); United States v. Basurto, 497 F.2d 781, 785 (9th Cir. 1974).

- **Claim 4c: Presentation of false trial testimony of key expert witness**, violating Petitioner's due process rights.  This evidence was particularly prejudicial because the disputed testimony was the only real evidentiary connection between Judi Eftenoff's death and homicide.  (Docs. 1, at 26-28; 24, at 23.)  Petitioner cites Giglio v. United States, 405 U.S. 150, 154 (1972); Napue, 360 U.S. at 271; Maxwell v. Roe, 628 F.3d 486, 508 (9th Cir. 2010); Young, 17 F.3d at 1203.

- **Claim 6: Unconstitutional denial of an evidentiary hearing into juror misconduct** following proof that at least one juror communicated with third parties about the case during jury deliberations.  (Docs. 1, at 36; 24, at 24.)  Petitioner cites Remmer v. United States, 47 U.S. 227, 229 (1954); State v. Miller, 178 Ariz. 555 (1994).

- **Claim 7a: Ineffective assistance of trial counsel in failing to consult an independent pathologist**, a simple investigative task that would have enabled defense counsel to, consistent with his selected trial theory, conclusively prove that Judi Eftenoff was not murdered.  (Docs. 1, at 37-38, 42; 24, at 24.)  Petitioner cites Strickland v. Washington, 466 U.S. 668 (1984); Holsomback v. White, 133 F.3d 1382 (11th Cir. 1998).

- **Claim 7d: Ineffective assistance of trial counsel in failing to adequately challenge the key expert testimony** against Petitioner, including failing to request a Frye hearing and failing to adequately cross-examine the expert.  (Docs. 1, at 41, 42-44; 24, at 24.)  Petitioner cites Strickland; Holsomback.

- **Claim 8a: Denial of procedural due process in depriving Petitioner of his protected liberty interest** in proving his actual innocence, as provided by Arizona Rule of Criminal Procedure 32.1(h).  (Docs. 1, at 61, 63; 24, at 24.)  Petitioner cites Dist. Atty's Office v. Osborne, 577 U.S. 52, 68 (2009).

- **Claim 8b: Actual innocence** sufficiently proven to render unconstitutional Petitioner's continued physical detention.  (Docs. 1, at 48, 63; 24, at 25.)  Petitioner cites Osborne, 577 U.S. at 68; Schlup v.

1

2

<u>Delo</u>, 513 U.S. 298, 324-25 (1995). [Petitioner only raises this claim as to his murder conviction, not as to his transfer of narcotics conviction. <u>See</u>, Docs. 1 at 48-64; 24 at 34-88.]

3      Petitioner's habeas petition had originally identified Claim 8 as a single claim of

4  actual innocence. (Doc. 1 at 48-64.)  In Petitioner's Reply to Response to Habeas Petition,

5  he asserts that Petitioner's Claim 8 was actually divided into two claims.  Petitioner claims

6  that "[w]ithin Ground Eight of his Petition, Eftenoff makes two claims. . . .First, Eftenoff

7  makes a procedural due process claim for deprivation of his protected liberty interest in

8  proving his actual innocence under Arizona Rule of Criminal Procedure 32.1(h). . . . *See* Pet.

9  at 62." (Doc. 24 at 35.) Yet, no such indication appears on the cited page or anywhere within

10  the text associated with Claim 8 in Petitioner's habeas petition.  On the basis of Petitioner's

11  interpretation of the scope of his own claim, he identifies his due process claim as Claim 8a,

12  and his actual innocence Claim as 8b.  (<u>Id.</u>)

13                                    **DISCUSSION**

14  **I.     Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).**

15          **A.     Claim Cognizability**

16      The AEDPA provides that the Court can grant habeas relief "only on the ground that

17  [a petitioner] is in custody in violation of the Constitution or laws or treatises of the United

18  States."  28 U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010).  "[I]t is not the

19  province of a federal habeas court to reexamine state-court determinations on state-law

20  questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991); <u>see</u> <u>Gilmore v. Taylor</u>, 508 U.S.

21  333, 348-49 (1993) ("a mere error of state law, one that does not rise to the level of a

22  constitutional violation, may not be corrected on federal habeas."); <u>Lewis v. Jeffers</u>, 497 U.S.

23  764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law").  And, a

24  petitioner may not "transform a state law issue into a federal one merely by asserting a

25  violation of due process."  <u>Poland v. Stewart</u>, 169 F.3d 573, 584 (9th Cir. 1999) (quoting

26  <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1996)); <u>see</u> <u>Engle v. Isaac</u>, 456 U.S. 107, 120-

27  21 (1982) ("While they attempt to cast their first claim in constitutional terms, we believe

28  that this claim does no more than suggest that the instructions at respondents' trials may have

1   violated state law."). A habeas petition "must allege the petitioner's detention violates the

2   constitution, a federal statute or a treaty." Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989).

3   **B.   Exhaustion and Procedural Default**

4   Before a federal court may grant habeas corpus relief to a state prisoner, the prisoner

5   must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); O'Sullivan v.

6   Boerckel, 526 U.S. 838, 842 (1999); Coleman v. Thompson, 501 U.S. 722, 731 (1991). The

7   federal court will not entertain a petition for writ of habeas corpus unless each and every

8   issue has been exhausted. Pliler v. Ford, 542 U.S. 225, 230 (2004); Rose v. Lundy, 455 U.S.

9   509, 521-22 (1982). To properly exhaust state remedies, the prisoner must have afforded the

10   state courts the opportunity to rule upon the merits of his federal constitutional claims by

11   "fairly presenting" them to the state courts in a procedurally appropriate manner. Castille v.

12   Peoples, 489 U.S. 346 (1989); Baldwin v. Reese, 541 U.S. 27, 29 (2004) (stating that "[t]o

13   provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' her claim

14   in each appropriate state court . . . thereby alerting the court to the federal nature of the

15   claim."). A petitioner must describe both the operative facts and the federal legal theory so

16   that the state courts have a "fair opportunity" to apply controlling legal principles to the facts

17   bearing on his constitutional claim. Id., at 33. In cases not carrying a life sentence or the

18   death penalty, claims are exhausted once the Arizona Court of Appeals has ruled on them.

19   Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999).

20   Where a prisoner fails to "fairly present" a claim to the state courts in a procedurally

21   appropriate manner, his claims are procedurally defaulted. Ylst v. Nunnemaker, 501 U.S.

22   797, 802-05 (1991); Coleman, 501 U.S. at 731-32. There are two types of procedural default.

23   First, a state court may have applied a procedural bar when the prisoner attempted to

24   raise the claim in state court. Nunnemaker, 501 U.S. at 802-05. For example, a habeas

25   petitioner may be barred from raising federal claims that he failed to preserve in state court

26   by making contemporaneous objections at trial or by raising the claim on direct appeal or

27   post-conviction review. Bonin v. Calderon, 59 F.3d 815, 841-42 (9th Cir. 1995)(stating that

28   failure to raise contemporaneous objection at trial to an alleged violation of federal rights

1   constitutes a procedural default of that issue); Thomas v. Lewis, 945 F.2d 1119, 1121 (9th Cir.

2   1991)(finding procedural default where the Arizona Court of Appeals held that petitioner had

3   waived his claims by failing to raise them on direct appeal or in his first petition for post-

4   conviction review.)  If the state court found a procedural bar but also addressed the merits

5   of the underlying federal claim, the "alternative" ruling does not vitiate the independent state

6   procedural bar.  Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Carriger v. Lewis, 971 F.2d

7   329, 333 (9th Cir. 1992) (en banc court held that a state court may alternatively deny relief

8   on the merits of a federal constitutional claim even after dismissing the claim on procedural

9   grounds).

10       A higher court's subsequent summary denial of review affirms the lower court's

11   application of a procedural bar.  Nunnemaker, 501 U.S. at 803.  In order to "constitute

12   adequate and independent grounds sufficient to support a finding of procedural default, a

13   state rule must be clear, consistently applied, and well-established at the time of the

14   petitioner's default."  Wells v. Maass, 28 F.3d 1005, 1010 (9th Cir. 1994).  Arizona courts

15   have consistently applied their procedural default rules.  Stewart v. Smith, 536 U.S. 856, 860

16   (2002)(holding that Arizona Rule of Criminal Procedure 32.2(a) is an adequate and

17   independent procedural bar); Ortiz v. Stewart, 149 F.3d 923, 931-32 (9th Cir. 1998)(rejecting

18   the argument that Arizona courts have not "strictly or regularly followed" Rule 32); Carriger,

19   971 F.2d at 333 (rejecting the assertion that Arizona courts' application of procedural default

20   rules had been "unpredictable and irregular").

21       In the second procedural default scenario, the state prisoner may not have presented

22   the claim to the state courts, but pursuant to the state courts' procedural rules, a return to state

23   court would be "futile."  Teague v. Lane, 489 U.S. 288, 297-99 (1989).  Generally, any claim

24   not previously presented to the Arizona courts is procedurally barred from federal review

25   because any attempt to return to state court to properly exhaust a current habeas claim would

26   be "futile." Ariz. R. Crim. P. 32.1, 32.2(a) & (b); Beaty v. Stewart, 303 F.3d 975, 987 (9th

27   Cir. 2002); Ariz. R. Crim. P. 32.1(a)(3) (relief is precluded for claims waived at trial, on

28   appeal, or in any previous collateral proceeding); Ariz. R. Crim. P. 32.4 (stating that in a

1  Rule 32 of-right proceeding, notice of post-conviction relief must be filed within 90 days
2  after entry of judgment and sentence or within 30 days appellate mandate); Ariz. R. Crim.
3  P. 32.9 (stating that petition for review must be filed within thirty days of trial court's
4  decision).  A state post-conviction action is futile where it is time barred.  <u>Beaty</u>, 303 F.3d
5  at 987; <u>Moreno v. Gonzalez</u>, 116 F.3d 409, 410 (9th Cir. 1997) (recognizing untimeliness
6  under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition for post-
7  conviction relief, distinct from preclusion under Rule 32.2(a)).

8         In either case of procedural default, federal review of the claim is barred absent a
9  showing of "cause and prejudice" or a "fundamental miscarriage of justice."  <u>Dretke v.</u>
10 <u>Haley</u>, 541 U.S. 386, 393-94 (2004).  To establish cause, a petitioner must establish that
11 "some objective factor external to the defense impeded [his] efforts to comply with the
12 State's procedural rules."  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)  The following
13 objective factors may constitute cause: (1) interference by state officials, (2) a showing that
14 the factual or legal basis for a claim was not reasonably available, or (3) constitutionally
15 ineffective assistance of counsel.  <u>Id.</u>  To establish prejudice, a prisoner must demonstrate
16 that the alleged constitutional violation "worked to his actual and substantial disadvantage,
17 infecting his entire trial with error of constitutional dimension."  <u>United States v. Frady</u>, 456
18 U.S. 152, 170 (1982) (emphasis omitted).  Where petitioner fails to establish cause, the court
19 need not reach the prejudice prong.

20        To establish a "fundamental miscarriage of justice" resulting in the conviction of one
21 who is actually innocent, a state prisoner must establish that it is more likely than not that no
22 reasonable juror would have found him guilty beyond a reasonable doubt in light of new
23 evidence.  <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).

24        **C.    Merits Analysis**

25        In reviewing a cognizable claim under the AEDPA, a federal court "shall not" grant
26 habeas relief with respect to "any claim that was adjudicated on the merits in State court
27 proceedings" unless the State court decision was (1) contrary to, or an unreasonable
28 application of, clearly established federal law as determined by the United States Supreme

1    Court; or (2) based on an unreasonable determination of the facts in light of the evidence

2    presented in the State court proceeding.  28 U.S.C. § 2254(d); see Williams v. Taylor, 529

3    U.S. 362, 412-413 (2000) (O'Connor, J., concurring and delivering the opinion of the Court

4    as to the AEDPA standard of review).  "When applying these standards, the federal court

5    should review the 'last reasoned decision' by a state court ...." Robinson v. Ignacio, 360 F.3d

6    1044, 1055 (9th Cir. 2004).

7           A state court's decision is "contrary to" clearly established precedent if (1) "the state

8    court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,"

9    or (2) "if the state court confronts a set of facts that are materially indistinguishable from a

10   decision of [the Supreme Court] and nevertheless arrives at a result different from [its]

11   precedent."   Taylor, 529 U.S. at 405-06.   "A state court's decision can involve an

12   'unreasonable application' of Federal law if it either (1) correctly identifies the governing rule

13   but then applies it to a new set of facts in a way that is objectively unreasonable, or (2)

14   extends or fails to extend a clearly established legal principle to a new context in a way that

15   is objectively unreasonable."  Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002)

16   (citation omitted).   This Court must "presume the correctness of [the] state courts' factual

17   findings" and a petitioner has the burden to "rebut this presumption with 'clear and

18   convincing evidence.'" Schriro v. Landrigan, 550 U.S. 465, 473-474 (2007) (quoting 28

19   U.S.C. §2254(e)(1)).

20          As to a claim of actual innocence, 28 U.S.C. §2254(d)(1) provides that habeas relief

21   may be granted on an adjudicated state prisoner's claim only if the state court's decision was

22   "contrary to, or involved an unreasonable application of, clearly established Federal law, as

23   determined by the Supreme Court of the United States."  The Supreme Court has not yet

24   recognized actual innocence as a grounds for habeas relief absent an independent

25   constitutional violation occurring in the underlying state criminal proceedings.  See Herrera

26   v. Collins, 506 U.S. 390, 400-401 (1993).  The Ninth Circuit Court of Appeals has noted that

27   a majority of the Justices in Herrera would have supported a claim of free-standing

28   innocence, and that "a habeas petitioner asserting a freestanding innocence claim must go

beyond demonstrating doubt about his guilt, and must affirmatively prove he is probably innocent." Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000) (evidence that is subject to conflicting interpretation does not make the "required showing of probable innocence"). See also, Carriger v. Stewart, 132 F.3d 463, 477 (9th Cir. 1997), cert. denied, 523 U.S. 1133 (1998) (court rejected freestanding actual innocence claim, noting that petitioner had "presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor [was] there any new and reliable physical evidence, such as DNA, that would preclude the possibility of guilt."); Jones v. Taylor, 763 F.3d 1242, 1251 (9th Cir. 2014) ("The most that can be said of the new testimony is that it undercuts the evidence presented at trial. Evidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence.").

An actual-innocence federal habeas claim that is procedurally defaulted, or raised after the expiration of the AEDPA statute of limitations, may be heard, if Petitioner "persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin v. Perkins, __ U.S. __; 133 S.Ct. 1924, 1928 (2013) (citing Schlup, 513 U.S. at 329). The court should "count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." Id.

## II. Unexhausted Claims.

Claim 4a: Presentation of false evidence in the grand jury violating Petitioner's due process rights, when the sole witness lied to and misled the grand jury who indicted Petition on false charges. (Docs. 1, at 24; 24, at 23.)

Claim 4c: State's key witness, Dr. Baselt, testified falsely, and misrepresented to the jury that the VOD formula he had used was scientifically valid and applicable and that an error rate of 30% was appropriate.

Claim 7a: Petitioner's trial counsel was ineffective for failing to consult with an independent pathologist to prove that the internal bruises on the victim's neck were not in fact bruises, and that forced swallowing is impossible in unconscious people.

Claim 8b: Actual Innocence.

Petitioner acknowledges that these claims are unexhausted. (Docs. 24 at 3; 25 at 2.)

1   The Court previously denied Petitioner's motion to stay and abey these claims, finding that
2   Petitioner had failed to demonstrate (1) good cause for his failure to exhaust these claims, (2)
3   that the unexhausted claims are potentially meritorious, and (3) that Petitioner's appellate or
4   PCR counsel were ineffective for not raising these claims.  (Docs. 35; 40.)   Petitioner now
5   claims that his "actual innocence" may be used as a "gateway" to escape this procedural bar
6   in federal habeas proceedings, allowing the federal court to consider the claim on the merits.
7   (Doc. 46, at 3.)

8            **A.     Innocence Gateway.**

9            A federal court may review the merits of a procedurally defaulted habeas claim if the
10   petitioner demonstrates that failure to consider the merits of his claim will result in a
11   "fundamental miscarriage of justice."  Schlup, 513 U.S. at 327.  A "fundamental miscarriage
12   of justice" occurs when a constitutional violation has probably resulted in the conviction of
13   one who is actually innocent.  Id.   This occurs only in a "narrow class of cases" in which
14   a petitioner makes the extraordinary showing that an innocent person was probably convicted
15   due to a constitutional violation.  Id.  Actual innocence thus serves as a "gateway" for a
16   petitioner to have procedurally or time-barred constitutional claims reviewed.  McQuiggin,
17   __ U.S. at__, 133 S.Ct. at 1928; Smith v. Baldwin, 510 F.3d 1127, 1139-49 (9th Cir. 2007)
18   (en banc) (A claim of innocence under Schlup is "not itself a constitutional claim, but instead
19   a gateway through which a habeas petitioner must pass to have his otherwise barred
20   constitutional claim considered on the merits.").

21            To make such a showing, a petitioner must prove with new reliable evidence that "it
22   is more likely than not that no juror, acting reasonably, would have found petitioner guilty
23   beyond a reasonable doubt."  Schlup, 513 U.S. at 329.  This new reliable evidence may
24   include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical
25   physical evidence that was not presented at trial."  Id., at 324.  The habeas court must
26   consider "all the evidence," without regard to whether it would necessarily be admitted under
27   rules of admissibility that would govern at trial.  Id., at 328.  A showing that a reasonable
28   doubt exists in the light of the new evidence is not sufficient: rather, the petitioner must show

that "it is more likely than not that no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt." Id., at 327.  Typically, the "precedents holding that a habeas petitioner satisfied [the Schlup standard]" have "involved dramatic new evidence of innocence." Larsen v. Soto, 742 F.3d 1083, 1095-96 (9th Cir. 2013).

Petitioner claims that new evidence establishes that the blow to the victim's head could have caused her death, and that prosecution's theory that the victim had been forced to swallow cocaine has been wholly discredited.  This "new evidence," to be clear, was presented by Petitioner in PCR proceedings, which the trial judge heard over a period of eight days.

As a starting point, none of the experts who testified at trial would opine how the cocaine was introduced into the victim's system, nor definitely opine that cocaine was not forced down the victim's throat, such that the evidence Petitioner presented in PCR proceedings was directly contradictory or conclusively refuted the trial testimony of the state's witnesses.  (Doc. 16 at 63-64.)  Petitioner extensively cross-examined Dr. Baselt during trial regarding the validity of the VOD[1] formula and his calculations.  (Doc. 16-6 at 125-49.)  Dr. Baselt opined that the victim had ingested one large overdose of cocaine within 1-2 hours of her death, and came to that conclusion taking into account both urine and blood toxicology.  (Doc. 16-6 at 99.)  Toxicologist Norman Wade, and Dr. Steven Karch testified at trial and disputed Dr. Baselt's use of the VOD formula postmortem, and thus, the jury was presented with evidence of a disagreement in the scientific community.  (Docs. 16-6 at 125-158; 16-9 at 49-117.)  In addition, Dr. Karth opined that the victim probably used a lot of cocaine within 24 hours, and died of subarachnoid hemorrhage, secondary to cocaine use.  (Doc. 16-9 at 101.)  Thus, the jury was presented with evidence of a disagreement in the

---

[1]Dr. Baselt testified at trial that the victim had ingested between 500 milligrams and 1 gram of cocaine within one or two hours of her death, with a 30% margin of error.  (Doc. 16-6 at 115, 141-42, 152)  The state's expert, Dr. Kelly, testified during the PCR proceedings that, just analyzing the cocaine in the victim's blood, he calculated that the victim had taken in between 117 and 372 milligrams of cocaine, taking into account other factors.  (Doc. 17-6 at 59-62.)

1  scientific community as to the use of the VOD formula in determining the quantity of cocaine

2  consumed by the victim prior to her death.

3      During the PCR hearing, Petitioner again called Mr. Wade and Dr. Karch to testify,

4  as well as several other witnesses, who criticized  Dr. Baselt's methods and testimony.

5  Contrary to Petitioner's assertions, the State's expert, forensic toxicologist Dr. Raymond

6  Kelly, testified during the PCR proceedings[2] that Dr. Baselt's conclusions regarding the

7  amount of cocaine the victim had ingested was within the "wide" limits of the calculation,

8  although at the high end, and that "opinions about postmortem toxicology are always

9  somewhat unreliable." (Doc. 17-6 at 56-61, 65.) Dr. Kelly agreed with Dr. Baselt's use of

10  the VOD formula: "Yes, I think it was a reasonable approach.  I use it.  I mean, it's similar

11  to what I would do.  And that's . . . I feel compelled to add his overall opinion had a lot to

12  do with other components than just that calculation."  (Doc. 17-5 at 216.)

13      Petitioner also called Dr. Dressler, a pathologist, who testified during the PCR hearing

14  that pouring 4.2 liters of a liquid down an unconscious person would be impossible "unless

15  you put a hose down their esophagus and pumped it into their stomach and then pulled the

16  hose out."  (Doc. 17-3 at 33-34.)   He also acknowledged, however that he is not a

17  toxicologist and that he is "deficient" in the area of "postmortem redistribution of cocaine

18  in a body."  (Id. at 20.)

19      Petitioner claims that the use of the VOD formula to determine cocaine levels post-

20  mortem had been disfavored by forensic toxicologists after trial.  The fact that Dr. Baselt's

21  VOD formula may have been called into question at a Society of Forensic Toxicologists

22  ("SOFT") convention after Petitioner's trial is not new, nor "exculpatory scientific evidence,

23  trustworthy eyewitness accounts, or critical physical evidence" of Petitioner's innocence.

24  Schlup, 413 U.S. at 324.  Dr. Kelly also disputed the significance of the SOFT convention

25  during the PCR hearing.  (Doc. 17-5 at 183-191.)  The fact that a position paper arose from

26

27      [2]Petitioner asserts that this evidence arose "since Petitioner's PCR hearing," but then

28  cites the PCR record.  (Doc. 46, at 6.)

the SOFT convention is simply cumulative evidence of the disagreement in the scientific community that was already presented by Petitioner during trial.  Petitioner claims that new evidence establishes that the bruises on the victim's neck were not bruises, citing the opinion of Dr. Dressler, a pathologist.  Dr. Dressler did not testify that the bruises on the victim's neck were not in fact bruises, only that additional testing could have been done to confirm the findings of the state's experts.  (Doc. 17-3 at 28-32.)  Also, during the hearing Petitioner called Dr. Moseley, who had performed the autopsy on the victim along with Dr. Keen, and who had previously testified at trial.  Dr. Moseley testified that he did not observe "strap muscle hemorrhages" which he would expect to see if someone's neck had been traumatized, but did note that there was a traumatic injury to the victim's body and that there was a large amount of cocaine within her system, but that the question was, "due to what?"  (Doc. 17-5 at 73-76, 90-91, 108-09.)  Petitioner's new evidence is not "new," and in any event merely cumulative of trial evidence.

Petitioner also claims new evidence establishes the fact that the victim had one cerebral artery on one side of her brain that did not divide.  This fact is not new evidence, as it was noted in the victim's autopsy report and therefore known at the time of trial.  Moreover, none of the experts, either at trial or in Petitioner's PCR hearing has ever opined that this increased the victim's likelihood of suffering a stroke.  Indeed, Dr. Dressler testified that he did not know what, if any, risk factors might be associated with this rare condition.  (Doc. 17-3 at 14-69.)

Finally, Petitioner ignores the non-scientific evidence of guilt presented at trial: the evidence of domestic violence by Petitioner, the evidence of conflicts over money between the victim and Petitioner, evidence that Petitioner had previously forced the victim to swallow an ecstasy pill, the victim's injuries consistent with a struggle, Petitioner's statements made that the victim died of cocaine overdose before any medical examiner report was released, Petitioner's giving money to his gambling companion and thus prolonging their time away from his residence, Petitioner's bizarre gesture to the nanny indicating the victim's death, Petitioner's bizarre actions relating to the box containing the note and cocaine that was

sent to his in-laws, the lack of any evidence of another suspect, and the fact that Petitioner was the last person to be with the victim in the house before leaving to the casino.  Given all of the evidence presented at trial, the controversy over the VOD formula and questions raised regarding its utility, Petitioner does not demonstrate that it is "more likely than not that no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt."  Schlup, 513 U.S. at 327.

On the last day of the 8-days of testimony in the PCR proceedings, the trial court made clear its view that Petitioner's evidence was cumulative to what had been presented at trial:

> [T]he cases say newly discovered evidence does not include evidence that is merely cumulative or impeaching.
> Now, one of my, one of my preliminary assessments of this case and all the evidence so far, one way it can be characterized as Dr. Baselt testified as he testified on the record and Dr. Karch testified.  Dr. Karch did not agree with Dr. Baselt.
> Now, to the extent we get a witness that comes in and says, I agree with Dr. Karch and therefore I disagree with Dr. Baselt, we now have testimony that is essentially cumulative to Dr. Karch and impeaching Dr. Baselt.  When we get a witness that comes in and says, I agree with Dr. Baselt and I disagree with Dr. Karch, we are having testimony that is cumulative to one and impeaching the other.

(Doc. 17-6 at 96-97)

> One thing I remember from Dr. Karch's testimony, when he was testifying I noticed quite a number of time he said, and my opinion is, and everyone else in the scientific community agrees with me, and my opinion is thus and so.  He said that several times.  You know, if one person is going to say it, okay, one person is going to say it.  I don't know if we need seven people to say it.

(Id. at 98)

> But the thing is you did have Dr. Karch.  And as I remember, Dr. Karch disagreed with Dr. Baselt.  And he said, it's invalid to use the volume of distribution, that's not proper, that's not valid, that's not scientifically accepted.

(Id at 101)

The dispute over method of calculating the amount of cocaine in the victim's system, and the question of how the cocaine was introduced into the victim's system (Dr. Baselt did not form an opinion as to how the cocaine was introduced) does not detract from the other incriminating evidence presented at trial that the victim had suffered an unnatural death and the evidence of Petitioner's knowledge and culpability.  Petitioner's PCR evidence may have

1    highlighted, or further demonstrated a disagreement in the scientific community as to the

2    method of calculating cocaine dose post-mortem, it does not necessarily amount to

3    reasonable doubt as to Petitioner's guilt in light of the other evidence presented at trial.  In

4    any event, a showing of some doubt in the light of new evidence is not sufficient to establish

5    the innocence gateway:  rather, the petitioner must show that "it is more likely than not that

6    no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt."

7    Schlup, at 327.

8          Considering all of the evidence presented at trial, and the "new" evidence Petitioner

9    has presented, Petitioner fails to establish that it is more likely than not that no reasonable

10   juror would have found him guilty beyond a reasonable doubt,[3] and thus no fundamental

11   miscarriage of justice occurred that excuses Petitioner's procedural default.

12   **III.    Exhausted Claims.**

13   **Claim 6: Unconstitutional denial of an evidentiary hearing into juror misconduct**
     following proof that at least one juror communicated with third parties about the case during
14   jury deliberations.
     (Doc. 1 at 33.)

15

16         Petitioner asserts that the trial court erred in failing to conduct an evidentiary hearing

17   regarding juror misconduct, in violation of his Fifth, Sixth, and Fourteenth Amendment

18   rights.  Respondents claim that Petitioner failed to exhaust this claim in the State Court by

19   not alerting the court to the federal nature of his claim.  (Doc. 43 at 15-19.)  The juror

20   misconduct alleged was that a juror had told his wife during jury deliberations that the jury

21   had taken a preliminary vote.  Petitioner asserts that this claim is exhausted because he

22   alerted the Arizona courts to the federal basis of this claim when he cited State v. Miller, 178

23   Ariz. 555 (1994), on direct appeal, because Miller "discussed at length federal law

24   controlling jury misconduct."  (Doc. 24 at 34.)  In his opening brief on appeal, Petitioner

25          [3]Having found that Petitioner fails to meet the Schlup 'innocence gateway,'

26   Petitioner's substantive claim of actual innocence which is based upon the same evidence
     presented to overcome procedural default, Claim 8b, and which requires affirmative proof
27   of probable innocence, necessarily fails on the merits, even if allowed as a 'freestanding'
     claim of actual innocence.  Carriger, 132 F.3d at 476.
28

framed his claim as follows: "[a] juror may have received evidence not properly admitted during trial by discussing the case with family and friends during jury deliberations." (Doc. 1-1 at 56.) The Arizona appellate court, in its opinion, cited <u>Miller</u> for the standard of review to be applied to "a trial court's ruling on whether to hold an evidentiary hearing regarding juror misconduct." (Doc. 17-2 at 31.)

During Petitioner's trial, a local restaurant employee had reported that a juror's wife, who was at the restaurant, told her that the jurors had taken a vote. (<u>Id.</u> at 57; Doc. 17-1 at 33-34.) The employee and the juror were interviewed at the trial court's direction, and the trial juror admitted under oath that he had told his wife the jury had taken a vote, but did not tell her what the vote was or anything else about the case. (Doc. 1-1 at 57; Doc. 17-1 at 37, 40.) The trial court denied Petitioner's request for an evidentiary hearing, finding no prejudice to Petitioner by the juror's conduct, and no basis pursuant to Ariz.R.Crim.P. 24.1(c)(3) for a new trial. (Doc. 1-1 at 57; Doc. 17-1 at 41.)

Petitioner claimed that the trial court "abused its discretion" by refusing to hold an evidentiary hearing to further explore the reaches of the juror's misconduct, and made the following legal argument in his opening brief:

> In <u>State v. Conn</u>, 137 Ariz. 152, 669 P.2d 581 (1982), the court affirmed the trial court's denial of a Motion for New Trial because the juror misconduct did not fall within one of the grounds enumerated in Rule 24.1(c)(3), However, Conn is distinguishable because the trial judge reached that conclusion only **after** a hearing on the issue. In the instant case, the judge denied the request to hold a hearing. A trial court must inquire into the extent and effect of the misconduct. <u>State v. Miller</u>, 178 Ariz. 555, 875 P.2d 788 (1994) (emphasis in original).
>
> In <u>State v. Spears</u>, 184 Ariz. 277, 289, 908 P.2d 1062, ____ (1996), the court cautioned that *"trial judges should err on the side of granting an evidentiary hearing so that they can gather as much relevant information as possible before making their rulings."* (emphasis in original).

(Doc. 1-1 at 58-59.)

In a heading that precedes twelve of Petitioner's claims on appeal, Petitioner asserts that "[t]he state violated [Petitioner]s state and federal constitutional due process right to a fair trial." (Doc. 1-1 at 4.) Petitioner provided no more specifics in his appellate brief about the legal nature of his claim.

1    Petitioner did not fairly present his claim by "alerting the court to the federal nature

2  of [his] claim." <u>Baldwin</u>, 541 U.S. at 29.  He did not describe the "federal legal theory," so

3  that the reviewing court would apply federal law and principles and correct constitutional

4  errors. <u>Id.</u>, at 33.   The federal nature of a claim must be explicit so as to place state courts

5  on notice that the petitioner is making a federal constitutional claim.  <u>Galvan v. Alaska

6  Department of Corrections</u>, 397 F.3d 1198, 1205 (9th Cir. 2005); <u>Rose v. Palmateer</u>, 395

7  F.3d 1108, 1111 (9th Cir. 2005).   Furthermore, "mere similarity" of state and federal

8  standards is not enough for fair presentation.  <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995).

9  A petitioner's "[m]ere mention of the federal Constitution as a whole, without specifying an

10 applicable provision," or "of a broad constitutional concept, such as due process," is not

11 sufficient to exhaust a federal claim.  <u>Fields v. Waddington</u>, 401 F.3d 1018, 1021 (9th Cir.

12 2005).

13    A "fair reading" of Petitioner's counseled appellate brief was that Petitioner cited the

14 <u>Miller</u> case to support an "abuse of discretion" review of his claim, which the appellate court

15 then adopted.  <u>See</u>, <u>Peterson v. Lampert</u>, 319 F.3d 1153, 1158 (9th Cir. 2003) (although

16 petitioner raised right to counsel claim and cited two state cases that analyzed the right under

17 the Sixth and Fourteenth Amendment, petitioner was represented by counsel and had also

18 claimed a denial of "adequate" assistance of counsel under the state constitution - a fair

19 reading of his petition was that the cases were cited to support state-law claim). In his

20 appellate brief, Petitioner cited <u>Conn</u>, which also set forth "abuse of discretion" as the

21 standard of review for a claim that a new trial should have been granted for juror misconduct,

22 and <u>Spears</u>, which discussed both state and federal law cases in support of the court's finding

23 that the defendant was not entitled to a new trial on allegations of juror misconduct.

24 Petitioner did not fairly present Claim 6 on appeal by alerting the reviewing court to the

25 federal nature of his claim, and thus, has not exhausted this claim.   Petitioner has

26 procedurally defaulted this claim, as he would be precluded from raising it again as a federal

27 claim in state court, and, for the reasons stated above, does not demonstrate a miscarriage of

28 justice to excuse his default.

1    Alternatively, Petitioner's claim has no merit.  The United States Supreme Court has
2    "repeatedly insisted" that "the right to be tried before a jury capable and willing to decide a
3    case solely on the evidence before it is a cornerstone of our criminal justice system."
4    Mcllwain v.U.S., 464 U.S. 972, 974-75 (1983).  As the Arizona appellate court held, there
5    was no evidence that the juror's wife "received any extraneous information about the case
6    [] [and that] any suggestion otherwise is pure speculation, [and], while it was improper for
7    [the juror] to inform his wife that a preliminary vote had been taken, [] no prejudice resulted
8    from the improper communication."  (Doc. 17-2 at 31.)     The trial court's inquiry was
9    sufficient to establish that the juror's communication was an isolated incident that did not
10   result in the jury receiving evidence from outside sources, and did not result in any prejudice
11   to Petitioner.  The state court's decision was not an unreasonable application of clearly
12   established federal law, or an unreasonable determination of facts in light of the evidence.

13   **Claim 7d: Ineffective assistance of trial counsel in failing to adequately challenge the
     key expert testimony** against Petitioner, including failing to request a <u>Frye</u> hearing and
14   failing to adequately cross-examine the expert.  (Docs. 1 at 41, 42-44; 24 at 24.)

15   Petitioner claims that his trial counsel was ineffective by not requesting a <u>Frye</u> hearing
16   on the admissibility of witness Baselt's testimony[4], and by not adequately cross-examining
17   him at trial regarding the questionability of his opinions.  "Under the Frye rule, once the
18   court determines the reliability of the procedure under the test of general acceptance,
19   evidence resulting from use of the particular technique is admissible, subject to a
20   foundational showing that the expert was qualified, the technique was properly used, and the
21   results were accurately recorded."  <u>State ex rel. Collins v. Superior Court, In and For the
22   Maricopa County</u>, 132 Ariz. 180, 196; 644 P.2d 1266, 1282 (Ariz. 1982); <u>State v. Lehr</u>, 201
23   Ariz. 509, 516; 38 P.3d 1172, 1179 (Ariz. 2002) (*en banc*) (to be admissible, a proponent of
24   novel scientific evidence must demonstrate that the principles being applied have reached
25   general acceptance in the scientific community, and also general acceptance of the

26

27   [4]To the extent Petitioner claims that witness' Baselt's testimony was false or
     misleading, this Court has already found that Petitioner has failed to demonstrate that this
28   claim is meritorious.  (Doc. 35, at 12.)

1   technique(s) being used).  Arizona has adopted the <u>Frye</u> test.  <u>Id.</u>  The test  "serves the

2   'salutary purpose of preventing the jury from being misled by unproven and ultimately

3   unsound scientific methods.'" <u>Id.</u>, at 199, 1285 (citation omitted).  "'General acceptance'

4   does not necessitate a showing of universal or unanimous acceptance." <u>State v. Velasco</u>, 165

5   Ariz. 460, 486; 799 P.2d 821, 827 (Ariz. 1990) (*en banc*).  Scientific disagreement in the

6   medical profession over the accuracy of a particular test "affects only the weight and not the

7   admissibility of evidence."  <u>State v. Olivas</u>, 77 Ariz. 118, 119; 267 P.2d 893, 894 (Ariz.

8   1954).

9        Petitioner asserted that the evidence of the unreliability of the VOD formula was

10  discovered after his trial. (Doc. 1-2 at 57-65.)  Thus, Petitioner's trial counsel could not have

11  been ineffective in not requesting a <u>Frye</u> hearing based upon this evidence.  In fact, Petitioner

12  stated in his PCR petition that Petitioner's trial counsel had "most assuredly met the 'due

13  diligence requirement'" with respect to the newly discovered facts.  (Doc. 1-2 at 65.)

14  Additionally, during Petitioners PCR hearing, his trial counsel testified extensively as to the

15  reasons why he did not request a <u>Frye</u> hearing.  (Doc. 17-3 at 104-163 to Doc. 17-4 at 8.)

16       Trial counsel testified that he was aware at the time of the trial that there was

17  disagreement in the relevant scientific community as to the use of the VOD formula to

18  determine postmortem levels of toxicity, and that it was in a preliminary peer-review process,

19  but that Dr. Baselt, and the other experts who testified at trial "each had their opinion based

20  upon some body of research or science or principles of science that could support their

21  position." (Doc. 17-3 at 119-120.) Based upon trial counsel's "conversation with Dr. Karch

22  [he believed they] weren't going to get anywhere with that and [he preferred] to have Dr.

23  Karch testify and Norman Wade testify, . . . [as] they were both very credible witnesses."

24  (<u>Id.</u>) Trial counsel had hired Dr. Karch as an expert to advise him, and Dr. Karth advised that

25  there was disagreement in the scientific community.  Trial counsel also explained that

26  strategically, he decided not to request a hearing because, based upon the above, he didn't

27  think there was a likelihood he would be successful, and in the process, by having his experts

28  testify, ran the risk of revealing all of the impeachment information relating to his experts

1    before trial.  (Id. at 153; 17-4 at 5.)  Trial counsel weighed the likelihood of success of

2    getting the evidence precluded and the ramifications if not successful, and made the tactical

3    decision not to pursue a Frye hearing.  (Doc. 17-4 at 17-26.)

4         The two-prong test for establishing ineffective assistance of counsel was established

5    by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  In order to prevail

6    on an ineffective assistance claim, a convicted defendant must show (1) that counsel's

7    representation fell below an objective standard of reasonableness, and (2) that there is a

8    reasonable probability that, but for counsel's unprofessional errors, the result of the

9    proceeding would have been different. See id. at 687-88.

10        Regarding the performance prong, a reviewing court engages a strong presumption

11   that counsel rendered adequate assistance, and exercised reasonable professional judgment

12   in making decisions. See id. at 690. "[A] fair assessment of attorney performance requires

13   that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

14   circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

15   perspective at the time." Bonin v. Calderon, 59 F.3d 815, 833 (9th Cir. 1995) (quoting

16   Strickland, 466 U.S. at 689). Moreover, review of counsel's performance under Strickland

17   is "extremely limited": "The test has nothing to do with what the best lawyers would have

18   done. Nor is the test even what most good lawyers would have done. We ask only whether

19   some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel

20   acted at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir.), judgment rev'd on other

21   grounds, 525 U.S. 141 (1998). Thus, a court "must judge the reasonableness of counsel's

22   challenged conduct on the facts of the particular case, viewed as of the time of counsel's

23   conduct." Strickland, 466 U.S. at 690.  "Judicial scrutiny of counsel's performance must be

24   highly deferential."  Id. at 689.

25        If the prisoner is able to satisfy the performance prong, he must also establish

26   prejudice. See id. at 691-92; see also Smith, 528 U.S. at 285 (burden is on defendant to show

27   prejudice). To establish prejudice, a prisoner must demonstrate a "reasonable probability that,

28   but for counsel's unprofessional errors, the result of the proceeding would have been

1   different." Strickland, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient

2   to undermine confidence in the outcome." Id. A court need not determine whether counsel's

3   performance was deficient before examining whether prejudice resulted from the alleged

4   deficiencies. See Smith, 528 U.S. at 286 n.14. "If it is easier to dispose of an ineffectiveness

5   claim on the ground of lack of sufficient prejudice, which we expect will often be so, that

6   course should be followed." Id. (quoting Strickland, 466 U.S. at 697).

7       In reviewing a state court's resolution of an ineffective assistance of counsel claim,

8   the Court considers whether the state court applied Strickland unreasonably:

9       For [a petitioner] to succeed [on an ineffective assistance of counsel claim], ...
        he must do more than show that he would have satisfied Strickland's test if his
10      claim were being analyzed in the first instance, because under § 2254(d)(1),
        it is not enough to convince a federal habeas court that, in its independent
11      judgment, the state-court decision applied Strickland incorrectly. Rather, he
        must show that the [state court] applied Strickland to the facts of his case in an
12      objectively unreasonable manner.

13  Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citations omitted); see also Woodford v.

14  Visciotti, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause,

15  a federal habeas court may not issue the writ simply because that court concludes in its

16  independent judgment that the state-court decision applied Strickland incorrectly. Rather, it

17  is the habeas applicant's burden to show that the state court applied Strickland to the facts

18  of his case in an objectively unreasonable manner.") (citations omitted).  Reviewing court

19  gives "substantial weight" to the view of the trial judge rejecting an ineffective assistance of

20  trial counsel claim.  See, Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000).

21      The trial court found that Petitioner was not entitled to a Frye hearing, and that

22  Petitioner had failed to establish that he was entitled to relief on a claim of ineffective

23  assistance of counsel.  That decision and the appellate court's summary affirmation were not

24  based upon an unreasonable determination of the facts in light of the evidence presented at

25  trial and at the PCR hearing.  Trial counsel's belief, after consultation with experts, that he

26  would not be successful if a Frye hearing were granted, coupled with his reasonable

27  assessment that the defense could be compromised by subjecting his own experts to pretrial

28  cross-examination was a tactical decision many reasonable defense lawyers would have

1   made.

2       Even if Petitioner had requested a <u>Frye</u> hearing, there is no guarantee it would have

3   been granted, particularly in light of the fact that Petitioner's trial judge heard the trial

4   evidence, presided over the extended PCR hearing, and ruled that Petitioner was not entitled

5   to a <u>Frye</u> hearing.  In particular, the trial judge stressed the fact that the evidence presented

6   reflected a disagreement in the scientific community as to the VOD formula.  (Doc. 17-6 at

7   96-97.)  <u>See</u>, <u>Olivas</u>, 77 Ariz, at 119; 267 P.2d at 894.  (scientific disagreement in the medical

8   profession over the accuracy of a particular test goes to the weight, not admissibility of the

9   evidence). Thus, Petitioner does not establish a reasonable probability that, but for counsel's

10  unprofessional error in not requesting a <u>Frye</u> hearing, a request for a <u>Frye</u> hearing would have

11  been granted, and the evidence ultimately precluded.

12      Furthermore, even if Baselt's testimony regarding the use of the VOD formula to

13  calculate the quantity of cocaine ingested by the victim were excluded at trial, Petitioner can

14  not demonstrate prejudice.  First, all of the testifying toxicologists agreed that there was

15  cocaine in the victim's system, but disagreed as to how much, and did not offer an opinion

16  as to how it was ingested.  Petitioner's expert, Dr. Hearn, testified in PCR proceedings that

17  it is possible that an unconscious person could be forced to swallow a substance, and that

18  cocaine was the cause of the victim's death and the dose of cocaine was enough to cause

19  cerebral hemorrhage. (Doc. 17-2 at 245, 249.)  Even Dr. Karth testified in PCR proceedings

20  that he could not rule out oral ingestion.  (Doc. 17-6 at 87.)  The medical examiners testified

21  during trial that the victim's death was caused by stroke related to cocaine intoxication.

22  (Doc. 1-2 at 58-59.)  Although the State prosecutor discussed Baselt's testimony regarding

23  the VOD formula in its closing argument, he also recapped all of the other circumstantial and

24  scientific evidence and, in particular, emphasized that all of the evidence presented was like

25  a puzzle, and that the jurors should look at all of the pieces in putting the puzzle together.

26  (Doc. 17 at 45-50, 61, 64, 95.)  In light of all of the evidence presented, Petitioner does not

27  establish a reasonable probability that, but for counsel's unprofessional errors, the result of

28  the proceeding would have been different.

1    Given the Court's finding that trial counsel was not ineffective in not requesting a

2  <u>Frye</u> hearing, and that, in any event, there is no prejudice, the Court need not determine

3  whether or not Petitioner's PCR counsel was ineffective in not raising the claim in PCR

4  proceedings. <u>See</u>, <u>Martinez v. Ryan</u>, __ U.S. __, __; 132 S.Ct. 1309, 1318 (2012) (to excuse

5  procedural default, a petitioner must establish that the performance of post-conviction

6  counsel was deficient, which necessarily involves finding that the underlying claim is

7  substantial).

8    Petitioner also references a 48 Hours interview that aired after Petitioner's trial during

9  which he claims that "multiple jurors stated that they relied heavily on Dr. Baselt's testimony

10  regarding the quantity of cocaine that [the victim] had ingested in their decision to convict

11  him." (Doc. 1 at 16.)  Petitioner attaches no supporting documentation, no affidavits from

12  jurors, and nor does he cite any independent record that exists outside the record to support

13  his claim.  Bare allegations are simply not sufficient to justify an evidentiary hearing.  <u>See</u>,

14  28 U.S.C. §2254(e)(2).  Additionally, the Court is prohibited, as a general matter, from

15  inquiring into the thought processes of jurors, and their testimony is not admissible to

16  impeach a verdict.  <u>See</u> <u>State v. Nelson</u>, 273 P.3d 632, 643 ¶48 (Ariz. 2012).  This rule

17  serves, in part, to protect "the finality of jury verdicts."  <u>Id.</u> (citation omitted).

18  **Claim 8a: Denial of procedural due process in depriving Petitioner of his protected**
   **liberty interest** in proving his actual innocence, as provided by Arizona Rule of Criminal
19  Procedure 32.1(h).  (Docs. 1 at 61, 63; 24 at 24.)

20    Nearly eighteen months after filing his PCR petition, and after day three of the 8-day

21  PCR evidentiary hearing, on June 16, 2005, Petitioner's PCR counsel filed a motion to

22  amend the PCR petition to add a claim, pursuant to Ariz.R.Crim.P. 32.1(h), that he had

23  demonstrated by "clear and convincing evidence that the facts underlying the claim would

24  be sufficient to establish that no reasonable fact-finder would have found the defendant guilty

25  of the underlying offense beyond a reasonable doubt."  In his motion, Petitioner did not

26  identify the "facts" or the "claim" to which he was referring.  (Doc. 17-6 at 112.)  The State

27  filed a response opposing the motion to amend as untimely, as it was filed "over two and a

28  half years after filing the petition," and for the reason that Petitioner had not shown "good

cause" for the amendment as required by Ariz. R. Crim. P. 32.6(d).  (Doc. 17-6 at 116-17.) There is no indication in the record that the trial judge ruled on the motion, and no record of any further action on the part of Petitioner to advance the claim, despite the PCR hearings continuing, and not concluding until June 19, 2007, nearly 2 years later.  On October 31, 2008, the State filed a motion to dismiss the PCR proceedings, based on the fact that, at the close of the hearings on June 19, 2007, the trial court had directed Petitioner to identify any rebuttal witnesses, and, after 16 months, had failed to do so.  (Doc. 17-6 at 121.)

Both parties also filed Closing Memorandums.  In the State's Closing Memorandum, filed on May 7, 2009, it argued that, "it ha[d] become clear, during the prolonged course of the[] post-conviction proceedings, that the Defendant has no newly discovered evidence to present, . . . and that "[t]he array of witnesses that the Defendant paraded before this Court merely presented testimony on the same information presented at trial."  (Doc. 17-6 at 142-43.)  The State also asserted that the evidence presented by Petitioner did not rise to a colorable "newly-discovered evidence" claim, pursuant to <u>State v. Bilke</u>, 162 Ariz. 51; 781 P.2d 28 (1989), as it did not meet the five requirements, to include that "the evidence must be such that it would likely have altered the verdict, finding or sentence if known at the time of trial."  (Doc. 17-6 at 138.)

In PCR counsel's Closing Argument, she stated that "[r]egardless of what legal theory is applied; newly discovered evidence, ineffective assistance of counsel, or actual innocence, the fact remains that there was absolutely no evidence to support the prosecution's theory that [Petitioner] forced his wife to swallow a single fatal dose of cocaine," and that Dr. Baselt's conclusions were "completely invalid and without any supporting evidence."  (Doc. 1-4 at 39.)  PCR counsel stressed that "the testimony heard throughout the rule 32 hearings are one of laudable injustice.  Wrongful convictions are a perversion of Justice and an infection of evil without justification.  This is most certainly a case of wrongful conviction."  (Doc. 1-4 at 52.)      The trial court ultimately ruled that, "for the reasons and arguments presented by the State in its Closing Memorandum [], (1) Defendant's proposed evidence does not meet the requirements of Rule 32 and therefore does not entitle Defendant to post-

1   conviction relief, (2) Defendant's proposed evidence does not qualify as newly-discovered

2   evidence under Rule 32 and therefore does not entitle Defendant to post-conviction relief,

3   (3) Defendant is not entitled to a *Frye* hearing, and (4) Defendant has failed to establish that

4   he is entitled to relief on a claim of ineffective assistance of counsel." (Doc. 1-4 at 53-54.)

5       Petitioner claims he was denied a "protected liberty interest without due process" by

6   the trial court's failed to rule on his motion to amend, and thereby deprived of the right to

7   present, argue and obtain a ruling on his claim of actual innocence. (Doc. 24 at 82.) As an

8   initial matter, any claimed error in state court proceedings is not cognizable on habeas

9   review. See Villafuerte v. Stewart, 111 F.3d 616, 632 n. 7 (9th Cir. 1997) (stating that

10  petitioner's "claim that he was denied due process in his state habeas proceedings" was not

11  "addressable in a section 2254 proceeding"); Franzen v. Brinkman, 877 F.2d 26 (9th Cir.

12  1989) (holding "a petition alleging errors in the state post-conviction review process is not

13  addressable through habeas corpus proceedings"). Simply citing "due process" does not

14  "transform a state-law issue into a federal one." Langford, 110 F.3d at 1389.

15      Alternatively, Petitioner's claim fails on the merits, as it is clear by the record that the

16  trial court afforded Petitioner ample due process by conducting an extended evidentiary

17  hearing that afforded Petitioner the opportunity over the course of 2 years to present all of

18  the evidence supporting his claim. Other than filing a motion to amend that gave only bare

19  minimum notice of an actual innocence claim, Petitioner did nothing further over a period

20  of 24 months to advance the motion by requesting a ruling, or presenting the court with the

21  information supporting his claim. And, if the evidence of actual innocence was the newly

22  discovered evidence presented by Petitioner during PCR proceedings, Petitioner did in fact

23  argue that this evidence demonstrated actual innocence. Furthermore, this Court has already

24  found that:

25          It is clear by the record that the trial court's denial of Petitioner relief pursuant
            to Ariz.R.Crim.P. 32 was based upon the trial court's view, as argued by the
26          state, that Petitioner merely presented testimony cumulative to the same
            information presented at trial. Whether the standard upon further post-
27          conviction review is 'evidence that would probably change the verdict,' 'actual
            prejudice due to ineffective assistance,' or 'evidence establishing that no
28          reasonable fact-finder would have found Petitioner guilty beyond a reasonable

1         doubt,' the trial court made clear that the evidence was simply not sufficient
to support post-conviction relief.

2    (Docs. 35 at 16; 40.)

3         Subsequent to the trial court's denial of Petitioner's PCR claims,  Petitioner filed a

4    motion for reconsideration and then petitioned for review by the Arizona Court of Appeals,

5    arguing that the trial court abused its discretion by not ruling on Petitioner's actual innocence

6    claim, both of which were summarily denied.  (Docs. 1-4 at 57; 1-5 at 5, 6, 17, 31.)  The

7    denial of Petitioner's belated motion to amend, either by operation of law or pursuant to the

8    dismissal and denial of his PCR petition, does not demonstrate that he was denied an

9    opportunity to raise a Rule 32.1(h) claim, as the record of PCR proceedings amply

10    demonstrates.  Petitioner fails to demonstrate that the State court's failure to affirmatively

11    rule on his motion to amend, in light of its ruling on the merits Petitioner's claims, was

12    contrary to, or an unreasonable application of, clearly established federal law as determined

13    by the United States Supreme Court, or based on an unreasonable determination of the facts

14    in light of the evidence presented in the State court proceeding.

15                           **CONCLUSION**

16         The Court denies Petitioner's request for an evidentiary hearing, as the "record refutes

17    [Petitioner]'s factual allegations or otherwise precludes habeas relief." <u>Landrigan</u>, 550 U.S.

18    at 474.  Also, having found that Petitioner's Claims 4a, 4c, 7a, and 8b, are procedurally

19    defaulted and that Petitioner has failed to demonstrate cause and prejudice or a fundamental

20    miscarriage of justice to excuse the default, that Petitioner's Claim 6 is non-cognizable in

21    federal habeas and alternatively lacks merit, and that Claim 7 lacks merit and in any event

22    there is no prejudice, and that Claim 8a lacks merit, the Court will recommend that

23    Petitioner's habeas petition be denied and dismissed with prejudice.

24         **IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of

25    Habeas Corpus (Doc. 1) be **DENIED and DISMISSED** with prejudice.

26    \\\

27    \\\

28    \\\

1        This recommendation is not an order that is immediately appealable to the Ninth

2   Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

3   Appellate Procedure, should not be filed until entry of the district court's judgment.  The

4   parties shall have fourteen days from the date of service of a copy of this recommendation

5   within which to file specific written objections with the Court.  See 28 U.S.C. § 636(b)(1);

6   Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen

7   days within which to file a response to the objections.  Pursuant to Rule 7.2, Local Rules of

8   Civil Procedure for the United States District Court for the District of Arizona, objections

9   to the Report and Recommendation may not exceed seventeen (17) pages in length. Failure

10  timely to file objections to the Magistrate Judge's Report and Recommendation may result

11  in the acceptance of the Report and Recommendation by the district court without further

12  review.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure

13  timely to file objections to any factual determinations of the Magistrate Judge will be

14  considered a waiver of a party's right to appellate review of the findings of fact in an order

15  or judgment entered pursuant to the Magistrate Judge's recommendation.  See Rule 72,

16  Federal Rules of Civil Procedure.

17       DATED this 30th day of November, 2015.

18

19  _Michelle H. Burns_

20          Michelle H. Burns
         United States Magistrate Judge

21

22

23

24

25

26

27

28